**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MICHAEL PALL, MARY PALL, and )
EMILY PALL, a minor, by her parents )
and next friends Michael Pall and Mary Pall,)
                                                    )
      Plaintiffs, )
                                              ) Case No. 08 CV 3778
      vs. )
                                              ) Judge David H. Coar
THE VILLAGE OF INDIAN HEAD PARK,)
an Illinois Municipal Corporation, ) Jury Trial Demanded
                                              )
      Defendant. )

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

**I. Background**

Plaintiffs request this Court, pursuant to Rule 65 of the Federal Rules of Civil

Procedure, to enter an order for an injunction compelling the Defendant to allow

construction and placement of a safety fence surrounding the entirety of Plaintiffs'

backyard at 6472 Apache Drive, Indian Head Park, Illinois.

In this case, the Village of Indian Head Park (the "Village") has an ordinance that

states:

Fences are prohibited except as follows:

    A. Those required for safety as determined and upon such terms and
       conditions as may be imposed following the procedures for variations
       in this title…

Plaintiffs, Michael Pall ("Michael") and Mary Pall ("Mary")(collectively referred

to as the "Palls"), have an 8-year old daughter Emily Pall ("Emily") with Down

syndrome. Emily's diagnosis of Down syndrome qualifies her as handicapped, or

disabled, as defined by 42 U.S.C. § 3602(h). The Village of Indian Head Park, Illinois

has an ordinance prohibiting fences except "[t]hose required for safety." The Palls

submitted a plan for a variance to the property at 6472 Apache Drive, Indian Head Park,

Illinois, for a safety fence. The fence was necessary for Emily to safely use and enjoy the

outdoors on the property at 6472 Apache Drive. The fence would be made of wrought

iron, 5-feet high and fully covered by bushes and shrubbery. The Palls' plan requested the

Village permit the Palls to erect a fence, while maintaining a park-like atmosphere unlike

other fences or entrance gates in the Village. See Compl., ¶¶ 23, 25, 26, 30; Exhibit A,

"Pall Proposal". The Pall Proposal was necessary so that Emily could use and enjoy the

backyard of her home safely. Def's Answer, ¶¶ 41-43. The Village rejected the Pall

Proposal.

The Village did pass an ordinance granting a variance, but the variance (Exhibit

H) was never requested by the Palls and would not accommodate Emily Pall. See Exhibit

D; Exhibit E; Exhibit L. The Village determined a fence at 6472 Apache Drive could be

limited to a small area directly behind the residence. Moreover, the Village would require

the provision of annual medical reports to the Village documenting that Emily Pall's

disability still exists, and the medical reports would be subject to the Village's

independent medical review. The Village's Ordinance No. 07-20 discriminated against

Emily Pall because of her disability and subjected the Palls to differential treatment in

terms of a fence variance.

This matter is before the Court as a consolidated hearing on a preliminary and

permanent injunction. A party requesting a preliminary injunction must show: "(1) a

reasonable likelihood of success on the merits of the underlying claim; (2) no adequate

remedy at law; and (3) irreparable harm if the injunction is not granted." <u>Lucini Italia Co. v. Grappolini</u>, 288 F.3d 1035, 1038. (7th Cir. Ill. 2002).  "After a court has considered these three issues, it must weigh the potential harms and consider the public interest." <u>Id</u>. Moreover, once illegal discrimination has occurred, a federal court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." <u>See</u> Robert G. Schwemm, *Housing Discrimination Law and Litigation*, § 25:14 (Thomson Reuters/West 2008); <u>quoting</u> <u>Louisiana v. U.S</u>., 380 U.S. 145, 154 (1965). Equitable relief granted to remedy violations of the Fair Housing Act "should be structured to achieve the twin goals of assuring that the [Fair Housing] Act is not violated in the future and removing any lingering effects of past discrimination." <u>Marable v. Walker</u>, 704 F.2d 1219, 1221 (11th Cir. 1983).

## II.    There is a Substantial Likelihood that Plaintiffs will Prevail on the Merits of their Claim for Denial of a Reasonable Accommodation and Discrimination.

Under the Fair Housing Act, 42 U.S.C. § 3601, *et seq*., a plaintiff may prevail on one of any three theories: disparate treatment or intentional discrimination; disparate impact or discriminatory effect; or failure to accommodate. Schwemm, *Housing Discrimination Law and Litigation*, § 11.5(3)(c) at 11-58 to 11-59. In this case, Plaintiffs will likely prevail under both failure to accommodate and disparate treatment theories.

### a.    Village's Refusal to Make Reasonable Accommodation.

The Fair Housing Act (the "Act"), 42 U.S.C. § 3604(f)(2), prohibits discrimination against handicap individuals in the terms, conditions or privileges of sale of a dwelling or in the provision of services or facilities in connection with such a dwelling. Under the statute, unlawful discrimination includes:

A refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such persons equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

In this case, the Village of Indian Head Park (the "Village") has an ordinance that states:

Fences are prohibited except as follows:

A.    Those required for safety as determined and upon such terms and conditions as may be imposed following the procedures for variations in this title… <u>See</u> Exhibit I, § 17.12.120.

The Fair Housing Act is "a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." <u>Bronk v. Ineichen</u>, 54 F.3d 425, 428 (7th Cir. 1995). In passing the amendments to the Fair Housing Act, "Congress recognized that '[t]he right to be free from housing discrimination is essential to the goal of independent living." <u>Alliance for the Mentally Ill, et al. v. City of Naperville</u>, 923 F.Supp. 1057, 1069 (N.D.Ill. 1996); <u>quoting</u> H.R.Rep. No. 711, 100th Cong., 2nd Sess. at 13 (1985). The Fair Housing Act Amendments, and Section 3604(f), "repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered individuals." <u>Id</u>. "Generalized perceptions" are rejected as grounds for exclusion. <u>Id</u>.

The Fair Housing Act defines discrimination as the failure to reasonably accommodate an individual's disability in the provision of housing. <u>See</u> 42 U.S.C. § 3604(f)(3)(B). To establish a prima facie case of discrimination under § 3604 of the Fair Housing Act, plaintiffs must demonstrate (1) the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability; and (2) the benefit to plaintiff outweighs the cost to Defendant. <u>Bronk v. Ineichen</u>, 54 F.3d 425, 429 (7th Cir. 1995). Courts are accorded generous construction to the Fair Housing Act's anti-discrimination prescriptions. <u>Naperville</u>, 923 F.Supp. 1069.

The Plaintiffs have established a prima facie case of discrimination under the Fair Housing Act. Emily Pall is a handicapped/disabled person under the Fair Housing Act and the Defendant Village knew of her handicap and refused to allow her a fence providing full use and enjoyment of her backyard. Exhibit C; Exhibit D, p. 3, 11-14; Exhibit G; Def's Answer, ¶¶ 26, 41-43. The Village's refusal to permit construction of the fence under the Pall Proposal denied Emily and the Palls an equal opportunity to use and enjoy their home. Id. "Affirmative steps are required to change rules or practices if those steps are necessary to allow a person with a disability to live in the community." Horizon House Developmental Servs. Inc. v. Township of Upper Southampton, 804 F.Supp. 683, 699 (E.D.Pa. 1992). It is not proper for the Village disregard the disabled individuals request and determine their own reasonable accommodation. United States v. Freer, 864 F. Supp. 324 (W.D.N.Y. 1994); Oconomowac Res. Programs, Inc. v. City of Milwaukee, 300 F.3d 775 (7th Cir. 2002).

In this case, if the Palls can not enclose their backyard so that Emily has full enjoyment and use of the backyard, Emily may only use and enjoy her backyard if the Palls move to a community which allows erection of a safety fence enclosing their full backyard. The Village had an "affirmative obligation" to provide the requested accommodation because it would not impose an undue burden." U.S. v. California Mobile Home Park Management Co., 29 F.3d 1413, 1418 (9th Cir. 1994).

The Pall Proposal would have accommodated Emily by providing full use and enjoyment of the backyard and 6472 Apache Drive. Emily would then receive the therapeutic benefit of developing cognitive, physical, and social skills outdoors. Exhibit D, p. 3-4. The ability to run, to play, to learn, and to interact will enhance Emily's life.

Access to the full yard provides immeasurable value to any child; however, Emily's ability to live as an individual with Down syndrome is therapeutically aided when she is provided with the most useful tool for ameliorating the effects of her disability: playing outdoors. Id., p. 3-6. Furthermore, it would cost the Defendant Village nothing to permit construction of the fence under the Pall Proposal. Def's Answer, ¶ 23. The fence would be funded solely by the Palls (Def's Answer, ¶ 23), and place no administrative or financial hardship on the Village. Similarly, allowing the fence under the Pall Proposal posed no threat to the safety of any individuals. In fact, the fence in the Pall Proposal would have ensured the safety of one of the Village's life-long residents, Emily Pall.

The Village can not deny the reasonable accommodation request of the Pall Proposal because they consider themselves a community without fences; or out of aesthetic concern for a fence not enclosing a swimming pool. A local regulation that "impairs" a disabled individual's equal opportunity to use and enjoy their home "is preempted as applied if the [Village] has not crafted it 'to accommodate reasonably'" disabled individuals "while using 'the minimum practicable regulation [necessary] to accomplish the local authority's legitimate purpose." See, e.g., Pentel v. Mendota Heights, 13 F.3d 1261, 1263-64 (8th Cir. 1994). The Village's reasoning that the fence would be unsightly to "maintaining their park-like atmosphere" (See Exhibit D, p. 16) "rests on subjective considerations." Id. at 1265.  [T]his reason is undercut… by the [Village's] willingness to allow" the Pall's to construct a smaller inadequate fence and by the Village's allowance of fences throughout the Village around pools, if they existed prior to the passage of the ordinance, or in the form of gates to homes. Id. The Fair Housing Act requires the Village "reasonably to accommodate" Emily's needs as a

disabled individual with Down syndrome; "what is allowed is the 'minimum practicable regulation [necessary] to accomplish the local authority's legitimate purpose." Id. at 1266. The Village has a legitimate purpose to regulate fences in the Village; however, this police power does not give the Village the power of complete discretion to deny a reasonable accommodation.

The Village failed demonstrate that the Pall Proposal is unreasonable; i.e., imposes upon them an undue financial or administrative burden. See Southeastern Community College v. Davis, 442 U.S. 397, 412-13 (1979). The Village claims that the Pall Proposal will make it unfair to the residents who have not built fences. Exhibit D, Exhibit E. The Village proposed an arbitrary alternative: the fence must not be visible from the street or from the rear windows of the most vocal opponents to the fence. Id. Furthermore, the Village will not provide any adequate therapeutic benefit to Emily. The Village alternative was immediately objected by the Palls and does not accommodate Emily's individual needs.  See Exhibit "B". Emily requires a fence which allows full use and enjoyment of the backyard so she can receive the therapeutic value of being outdoors at home.

Plaintiffs will prevail on the merits of their claim that the Village denied their request for a reasonable accommodation in violation of the Fair Housing Act.

**b.  Direct Discrimination Against an Individual with a Disability.**

The Village of Indian Head Park violated the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, through Ordinance No. 07-20. Compl. ¶ 44-47; Exhibit H. By passing Ordinance No. 07-20 ("07-20"), the Village sets a separate standard for a person with a disability than it requires in other cases where residents request a fence for safety reasons.

Exhibit E, 11-14. The Village's passage of 07-20 is arbitrary, unreasonable, and not substantially related to the public health, safety, or welfare. See Exhibit E; Exhibit G; Exhibit H. Therefore, the Village has discriminated against the Palls in violation of 42 U.S.C. § 3604(f) by imposing different terms and conditions because of the disability of Emily Pall. As a result, the Palls will be awarded damages as authorized by 42 U.S.C. § 3613(c)(1).

07-20 facially discriminates against Emily Pall and disabled individuals similarly situated to Emily Pall. Under 07-20, the Village determined that a Down syndrome child may use their backyard with the safety of a fence if:

- The fence is "screened from view by landscaping consisting of evergreens at least five feet (5') in height… as close as possible to the fence… [t]he landscape plan shall be submitted to and approved by the Village of Indian Head Park…";

- The Plaintiffs must "annually submit to the Village… a report from a licensed medical professional evidencing that special needs of the [Plaintiffs]' child, Emily… [t]he Village… shall have the right to request and obtain an independent medical review… from a licensed medical professional to verify that special needs of the [Plaintiffs]' child, Emily…";

- The Plaintiffs must provide the Village… an estimate from a licensed fence contractor evidencing the cost of removal of the fence;

- Prior to installation, the Plaintiffs must deliver to the Village "a performance bond or letter of credit in the amount of the cost, determined by the Village… of the removal of the fence;

- In the event that fence is not removed as required by the Village's terms of the ordinance, the Plaintiffs grant the Village "the right to enter upon the subject property, by its own forces or by a contractor hired for such purpose by the Village… to remove the fence. See Exhibit "H", Ordinance 07-20, p. 7-8.

A plaintiff challenging a law that "facially single[s] out the handicapped and appl[ies] different rules" because of their handicap states a claim for disparate treatment.

Bangerter v. Orem City Corp., 46 F.3d 1491, 1500 (10th Cir. 1995). Malice or

discriminatory animus need not be proved to prevail; a plaintiff makes a prima facie case

for disparate treatment merely by demonstrating that the protected individual has been

subjected to differential treatment. Naperville, 923 F.Supp. at 1069; citing Bangerter, 46

F.3d at 1501. Moreover, the Village "may not use a technically neutral classification as a

proxy to evade the prohibition of intentional discrimination." McWright v. Alexander,

982 F.2d 222, 228 (7th Cir. 1992).

      The terms and conditions of 07-20 expressly single out the Palls by reason of their

daughter's disability. The Village not only refused the Palls variance request, they

adopted their own ordinance with qualifications and special provisions for a "safety

fence" under the Village Code when that fence is requested for the safety of a disabled

individual. Exhibit E, p. 11-14.  Ordinance 07-20 discriminates on its face against the

disabled because its reach overlaps with the definition of "handicap" under the Fair

Housing Act. See Horizon House Developmental Servs., Inc. v Township of Upper

Southampton, 804 F.Supp. 683, 694 (E.D.Pa. 1992, aff'd, 995 F.2d 217 (3rd Cir. 1993). In

adopting 07-20, the Village has applied different terms and conditions for "safety fence"

variances based on the physical and mental disabilities of the residents. Exhibit D;

Exhibit E. The Village not only refused a reasonable accommodation from their zoning

laws restricting fences, the Village has determined a safety fence for the disabled under

their Village Code requires: annual verification of the disabled individual's handicap;

submission of medical reports for the child; performance bonds; year-round complete

screening; and the right of the Village to enter onto the property and remove the fence

should the Village determine the fence is no longer necessary. Exhibit H.

The Village attempts to propose that it accommodated Emily Pall through Ordinance 07-20. Def's Answer, p. 17-18. The Palls never requested 07-20, but instead provided a request for an accommodation that was reasonable on its face and necessary to ameliorate the effects of Emily's disability. See Freer, 864 F. Supp. 324; Oconomowoc Res. Programs, 300 F.3d 775. Moreover, in Marbrunak v. City of Stow, the Sixth Circuit explained that a city "may impose standards which are different from those it subjects the general population, so long as the protection is demonstrated to be warranted by the unique and specific need and abilities of those handicapped individuals." 974 F.2d 43, 47 (6th Cir. 1992). However, generalized perceptions and unfounded speculations are rejected as grounds for exclusion. See H.R.Rep. No. 711, 100th Cong., 2nd Sess., at 18. Any requirement, term, or condition imposed on the disabled must correlate to "the actual abilities of the persons upon whom it is imposed." Potomoc Group Home Corp. v. Montgomery County, 823 F.Supp. 1285, 1300 (D.Md. 1993). In this case, there is no need for annual medical reports to verify that Emily Pall is handicapped or disabled. Exhibit D; Exhibit E; Exhibit H. The Village's perception, or neighbors speculations, that Emily will not now or in the future require the safety fence is both speculative and unfounded. Exhibit D; Exhibit E. Moreover, there is no nexus between Emily's disability and the requirements of 07-20. See Exhibit C; Exhibit G; Exhibit H.

07-20 only serves to exclude from the Village families with individuals suffering Down syndrome, mental retardation, or severe cognitive disabilities. See Exhibit J; Def's Answer, ¶ 24. The Plaintiffs will prevail on a claim for direct discrimination under the theory of disparate treatment.

**III.  Plaintiffs will Suffer Irreparable Injury that has No Adequate Remedy at Law Unless the Injunction is Issued.**

Without the issuance of the preliminary injunction, the Palls will suffer irreparable harm. Irreparable harm is an injury that is actual and imminent, an injury which cannot be compensated by monetary award. Galusha v. New York State Dep't of Envtl. Conservation, 27 F. Supp. 2d 117 (N.D.N.Y. 1998).

The gravamen of the Plaintiffs complaint is: without a safety fence which accommodates Emily Pall's disability, the Palls are forced to keep Emily inside when at home, causing irreparable injury, which no monetary damages could adequately compensate. Due to Emily's cognitive disability, the dangers outdoors are heightened without a safety fence, creating an immediate need. Due to Emily's cognitive disability, outdoor play in the freedom of her backyard promotes gross motor skills and consistency in experiences. The Village's actions deny Emily the therapeutic benefits of outdoor play in her own backyard.

In Galusha v. New York State Dep't of Envtl. Conservation, the Court found that an irreparable injury occurred when a park district did not provide equal access to a park. The Court held that every day the disabled plaintiffs missed in the park was an irreparable harm because monetary awards would not be a sufficient replacement for the loss. Id.

There is an immediate need for a safety fence surrounding the Pall's property. Without it, the possibility of physical injury to Emily is increased. As a result of her disability, Emily is unable to understand intangible concepts, such as danger. She is likely to wander out, or worse run out, of the Pall's unenclosed backyard. Emily is physically active, quick, agile, and has shown that she is capable of letting herself out of a single-

locked door. If Emily simply walked out her backdoor, Emily would encounter the dangers of wandering into another backyard, wandering into another house, or running into the busy street. Without the safety fence, the possibility of Emily encountering irreparable injury while at home increases. She is either subjected to developmental injury by remain caged at all times; or subjected to outside dangers if outdoors while at home without a safety fence. This irreparable injury can be prevented through a reasonable accommodation which will also allow Emily to receive the therapeutic benefits of her yard, as articulated in the Pall Proposal.

Emily's physician and the special education director for Emily's school both stated Emily would benefit greatly from the therapeutic effects of outdoor play. Exhibit C; Exhibit G. Without a safety fence, the Palls are unable to provide Emily with this therapeutic activity while at home. The Palls know the therapeutic benefits Emily enjoys playing outdoors, but must prevent Emily from going outdoors because of the danger she might be subjected to because of her disability. Emily is an active 8 year old girl with Down syndrome, a permanent disability which impairs cognitive and learning ability. Under the Pall Proposal, other children could come to the Palls home and play with Emily in the backyard. Emily's interaction with her peers would provide an excellent service to the development of Emily's speech and socialization skills.

Like many children, if Emily leaves the property on her own she might get lost, injured, or abducted. Unlike other children, Emily will not recognize the danger causing her to lose her way, get hit by a car, wander on a busy street, or meet a sexual predator.

The damage to Emily by being constantly restricted to the indoors is immeasurable and irreparable. Emily is still in the developmental stage in her life, and

she must be encouraged in every possible way to improve her quality of life. Without a

safety fence, the harm to Emily's development is irreparable and irretrievable. The Palls

can not regain the lost benefit of outdoor play in Emily's life during these next few years,

months, or even weeks. Every day that the Palls do not have a fenced backyard results in

further irreparable harm to Emily and the Palls. No amount of money will be able to

compensate the Palls for the loss of fully enjoying their property with their daughter. The

safety fence enclosing the backyard, allowing full use and enjoyment of the backyard, is

necessary to enhance Emily's life and lessen the effects of her disability.

## IV.   Threatened Injury to Plaintiffs Outweighs Any Damage the Proposed Injunction May Cause the Opposing Party.

The Palls' interest in this case substantially outweighs any damage to the

Village's interests. On its face, the Pall Proposal is a reasonable accommodation.

Oconomowoc Res. Programs, 300 F.3d 775. The Village has the burden to show that the

Pall proposal is an unreasonable accommodation for Emily's disability. Id.; see e.g.,

Freer, 864 F. Supp. 324.

The Palls appeared before the Village Zoning Commission and Board of Trustees

and showed the Village that their requested accommodation would affirmatively enhance

Emily's quality of life by reducing the effects of Emily's disability. See Exhibit D;

Exhibit E; Exhibit L; Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir. 1995). A letter from

Emily's medical doctor, Dr. Lisa A. Franco, M.D., was submitted to the Village

indicating Emily's best interest would be served by allowing Emily to play in her entire

backyard area, with boundaries safely designated by a fence. See Exhibit C. The Village

was informed by Jennifer Ames, Director of Special Education for the La Grange Area

Department of Special Education, that the Pall Proposal was necessary to allow Emily

access to major life functions, such as learning and socializing through playing and physical activity. <u>See</u> Exhibit "D", p. 4; Exhibit G.

Emily requires the fence in the Pall Proposal for her safety and for the therapeutic benefits of using her backyard. The Village of Indian Head Park and its residents object to the Pall's safety fence because of aesthetic concerns, or that others with disabilities might also want a fence. <u>See</u> Exhibit "E", p. 12. The safety of a disabled child clearly outweighs the desire for the aesthetics of a "fence-less" community. Emily's deprivation of therapeutic benefits gained by using her entire backyard area substantially outweighs any interest of the Village in restricting fences to enclosing swimming pools. Emily's inability to safely use her yard substantially outweighs any perceived damage to the Village's desire to not be like neighboring municipalities which allow fencing similar to the Pall Proposal.

**V.  The Injunction Would Not be Adverse to the Public Interest.**

"In fashioning equitable relief for the violation of the Fair Housing Act, trial courts ... are guided by its underlying purposes." <u>Smith v. Clarkton</u>, 682 F.2d 1055, 1068 (4th Cir. 1984). The declared purpose of the Fair Housing Act is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Fair Housing Amendments Act, which extended the protection of the federal fair housing laws to persons with disabilities, "is worded as a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals." <u>Bronk v. Ineichen</u>, 54 F.3d 425, 429 (7th Cir. 1995). The accommodation provisions of the Fair Housing Amendments Act, which the Village of Indian Head Park has violated in this case, are essential to carrying out this mandate.

## VI.  Conclusion

Plaintiffs respectfully request the Court to issue an order preliminarily enjoining the Defendant Village of Indian Head Park to permit Plaintiffs to erect a safety fence allowing adequate and full use of their backyard. <u>See</u> Exhibit F, "Fence". Plaintiffs request the Court immediately and permanently compel Defendant to allow the construction and placement of a five-foot high wrought iron or aluminum fence around the perimeter of the backyard property at 6472 Apache Drive, Indian Head Park, Illinois.

Dated: August 20, 2008

Respectfully Submitted,

Michael Pall, Mary Pall, and Emily Pall
Plaintiffs

By: _/s/ James C. Whiteside_____
    One of their Attorneys

James C. Whiteside (6292079)
Senior Law Students
The John Marshall Law School
Fair Housing Legal Clinic
28 E. Jackson Blvd., Suite 500
Chicago, Illinois 60604
312-786-2267/Fax: 312-786-1047



Kubiesa, Spiroff,
Gosselar & Acker, P.C.
Law Offices

533 West North Avenue, Ste. 204
Elmhurst, Illinois 60126
PHONE (630) 516-1800
FAX (630) 516-1808
E-MAIL: thefirm@ksgalaw.com
www.ksgalaw.com

September 11, 2007

VIA E-MAIL falonzo@indianheadpark-il.gov

Frank Alonzo, Village Administrator
Village of Indian Head Park
201 Acacia Drive
Indian Head Park, Illinois 60526

Re:     Application for Fence Permit
        6472 Apache Drive - Pall

Dear Mr. Alonzo:

Enclosed herewith you will find a revised plan for the fence on the Pall property, which will be installed as a safety measure with regard to their disabled daughter. A photo, which is included, shows that the fence will be black wrought iron, and will be installed on the inside of the Palls' lot line, so that existing bushes and bushes to be installed will completely screen the fence from all of the neighbors. We expect that utilizing the black wrought iron and screening by the bushes, the fence will be nearly invisible to the neighbors.

At the hearing before the Zoning Commission, we will provide colored drawings of this plan, including photographs, as well as explain how this fence promotes safety in the neighborhood and as to the Palls' daughter.

We appreciate the Mayor and the Village Council's consideration in referring this revised plan to the Zoning Commission for hearing.

Sincerely,

Kubiesa, Spiroff, Gosselar & Acker, P.C.

By: _____
Kenneth T. Kubiesa

KTK:kk

Enclosure

H:\Kathy\letters\alonzoL2.wpd



www.cedarrustic.com                    (800) 262-0388



**Black Birkshire**                                            5 / 16
Residential grade • Alternating spear point pickets • 2x2 posts with flat caps •
Fitted construction • 4-foot tall

5

TEST0000000000000136



EXHIBIT



**Kubiesa, Spiroff,
Gosselar & Acker, P.C.**
Law Offices

533 West North Avenue, Ste. 204
Elmhurst, Illinois 60126
PHONE (630) 516-1800
FAX (630) 516-1808
E-MAIL: thefirm@ksgalaw.com
www.ksgalaw.com

October 9, 2007

President Richard Andrews and The Board of Trustees
Village of Indian Head Park
201 Acacia Drive
Indian Head Park, Illinois 60526

      Re:    Pall/Application for Safety Fence Permit

Dear President Andrews and Trustees:

      I represent Mike and Mary Pall, who have applied to the Village of Indian Head Park for a safety fence, so that their daughter, Emily, can safely play in their back yard at 6472 Apache Drive. We appeared for a continued hearing before the Zoning and Planning Commission (ZPC) on Tuesday, October 2nd, and presented a revised plan for the safety fence, including photos of the five foot (5') high wrought iron fence enclosing the back yard well within its boundaries and fully screened. This fence allows Emily, a Down Syndrome child, to safely play within her back yard. At the hearing, we presented testimony and evidence concerning the nature of Emily's disability and the fact that the fence was necessary to protect Emily's safety as well as protect the neighborhood from Emily's wanderings.

      In spite of the overwhelming evidence that a fence as proposed by the Palls is necessary for Emily's safety and is a reasonable accommodation to Emily, the ZPC recommended a fence no wider than the house and twenty five feet (25') deep. This is a not a safety fence that reasonably accommodates Emily and allows her to pay in her back yard, but rather a "cage or "run". My clients would accept a compromise of a fence no wider than the house, but extending to within five feet (5') of the back lot line and fully screened from the outside.

      At the second hearing before the Zoning and Planning Commission, the only reason expressed for opposition to this fence were that no fences are allowed generally in Indian Head Park, and that my client knew this when they bought the house. These objections cannot legally form the basis of your decision not to grant the Palls' a reasonable accommodation for a fence permit based upon their proposal or the compromise offered above. Hopefully, the Village Board will do the right thing for Emily in this situation. If not, the Palls are prepared to continue beyond the Village Board to obtain approval for a fence.

                    Sincerely,

            By:                          
                    Kenneth T. Kubiesa

cc:    Mike Pall via e-mail redkap11@aol.com
       Frank Alonzo via e-mail falonzo@indianheadpark-il.gov



**Kubiesa, Spiroff,
Gosselar & Acker, P.C.**
Law Offices

533 West North Avenue, Ste. 204
Elmhurst, Illinois 60126
PHONE (630) 516-1800
FAX (630) 516-1808
E-MAIL: thefirm@ksgalaw.com
www.ksgalaw.com

October 9, 2007

President Richard Andrews and The Board of Trustees
Village of Indian Head Park
201 Acacia Drive
Indian Head Park, Illinois 60526

   Re: Pall/Application for Safety Fence Permit

Dear President Andrews and Trustees:

   I represent Mike and Mary Pall, who have applied to the Village of Indian Head Park for a safety fence, so that their daughter, Emily, can safely play in their back yard at 6472 Apache Drive. We appeared for a continued hearing before the Zoning and Planning Commission (ZPC) on Tuesday, October 2nd, and presented a revised plan for the safety fence, including photos of the five foot (5') high wrought iron fence enclosing the back yard well within its boundaries and fully screened. This fence allows Emily, a Down Syndrome child, to safely play within her back yard. At the hearing, we presented testimony and evidence concerning the nature of Emily's disability and the fact that the fence was necessary to protect Emily's safety as well as protect the neighborhood from Emily's wanderings.

   In spite of the overwhelming evidence that a fence as proposed by the Palls is necessary for Emily's safety and is a reasonable accommodation to Emily, the ZPC recommended a fence no wider than the house and twenty five feet (25') deep. This is a not a safety fence that reasonably accommodates Emily and allows her to pay in her back yard, but rather a "cage or "run". My clients would accept a compromise of a fence no wider than the house, but extending to within five feet (5') of the back lot line and fully screened from the outside.

   At the second hearing before the Zoning and Planning Commission, the only reason expressed for opposition to this fence were that no fences are allowed generally in Indian Head Park, and that my client knew this when they bought the house. These objections cannot legally form the basis of your decision not to grant the Palls' a reasonable accommodation for a fence permit based upon their proposal or the compromise offered above. Hopefully, the Village Board will do the right thing for Emily in this situation. If not, the Palls are prepared to continue beyond the Village Board to obtain approval for a fence.

        Sincerely,

        By: Kenneth T. Kubiesa

cc: Mike Pall via e-mail redkap11@aol.com
   Frank Alonzo via e-mail falonzo@indianheadpark-il.gov


EXHIBIT
B

**HINSDALE PEDIATRIC ASSOC., S.C.**

N. A. MOOSABHOY, M.D.    D. J. CAMPBELL, M.D.
K. PESHEK-CAMPBELL, M.D.    L. FRANCO, M.D.
S. TAPIA, M.D.    R. TREVINO, M.D.

911 N. ELM ST., SUITE 115
HINSDALE, ILLINOIS 60521

TELEPHONE: (630) 323-0890
FAX: (630) 323-9652

October 1, 2007

Kubiesa, Spiroff, Grosselar & Acker, P.C.
533 W. North Ave., Suite 204
Elmhurst, IL 60126

RE: Emily Pall

Dear Mr. Kubiesa:

Reference is made to your representation of the Pall family in regards to the Fence Permit Application made with the Village Of Indian Head Park.

Emily Pall has been my patient since birth. As you know, she has Trisomy 21 (known as Down Syndrome) with related impairments. It has been determined that she has a learning disability, speech impairment and mental retardation. She is in Special Education classes and attends various therapy sessions to assist her impairments. Her parents have acknowledged Emily's condition and have been extremely supportive.

I believe it would be in Emily's best interest to be allowed to play in her yard. She is unable to make appropriate decisions in regards to her safety and I believe Emily requires the boundaries of her environment to be safely designated by a fence. I strongly believe this is a safety issue for Emily and should be considered for her personal welfare.

Sincerely,

Lisa A. Franco, M.D.



# Village of Indian Head Park
# 201 Acacia Drive
# Indian Head Park, IL 60525

---

### MINUTES
### VILLAGE OF INDIAN HEAD PARK
### PLANNING AND ZONING COMMISSION
### PUBLIC HEARING

*"Pursuant to 5 ILCS 120/2.06 (3) minutes of public meetings shall include, but need not be limited to: a general description of all matters proposed, discussed, or decided, and a record of votes taken."*

### Tuesday, October 2, 2007
### 7:30 P.M.

## I.    CALL TO ORDER - CHAIRMAN DENNIS SCHERMERHORN

A public hearing was hosted by the Village of Indian Head Park Planning and Zoning Commission on Tuesday, October 2, 2007, at the Municipal Facility, 201 Acacia Drive. Chairman Dennis Schermerhorn noted that the Commission will discuss Zoning Petition # 162, a continuation of a public hearing regarding a petition for a safety fence for the property located at 6472 Apache Drive. He noted that the Planning and Zoning Commission in its advisory capacity will review all of the facts of the requested variance and once the public hearing is concluded, a recommendation will be presented to the Village Board for a formal vote on the matter. The meeting was convened at 7:30 p.m. by Chairman Dennis Schermerhorn and Kathy Leach, Planning and Zoning Commission Secretary, called the roll.

## II.    ROLL CALL:  PRESENT (AND CONSTITUTING A QUORUM):

Chairman Dennis Schermerhorn
Commissioner Diane Andrews
Commissioner Noreen Costelloe
Commissioner Earl O'Malley
Commissioner Jack Yelnick

**ALSO IN ATTENDANCE:**
Richard J. Ramello, Village Counsel, Storino, Ramello & Durkin

**NOT PRESENT:**
Commissioner Denise Ingram

**PETITIONER AND REPRESENTATIVES PRESENT:**

Mr. & Mrs. Michael Pall, owners of the property at 6472 Apache Drive
Kenneth Kubiesa, Petitioner's Counsel, Kubiesa, Spiroff, Gosselar & Acker, P.C.
Jennifer Ames, Director of Special Education, LaGrange Highlands School District 106

*PZC Minutes*
*October 2, 2007*

## III.    PLEDGE OF ALLEGIANCE TO THE FLAG

Chairman Schermerhorn and the Planning and Zoning Commission members led the audience in reciting the Pledge of Allegiance to the Flag as follows: ***"I Pledge Allegiance to the Flag of the United States of America and to the republic for which it stands, one nation under God indivisible with liberty and justice for all".***

## QUESTIONS AND/OR COMMENTS FROM INDIAN HEAD PARK RESIDENTS/PROPERTY OWNERS IN ATTENDANCE REGARDING ZONING AGENDA ITEMS

### IV.    CONTINUATION OF A PUBLIC HEARING HELD BEFORE THE VILLAGE OF INDIAN HEAD PARK PLANNING AND ZONING COMMISSION (PUBLIC COMMENTS RECEIVED AFTER DISCUSSIONS BY THE PLANNING AND ZONING COMMISSION MEMBERS AND PRIOR TO VOTES)

## ZONING AGENDA ITEM:

1.    *Petition #162 – Continuation of a Public Hearing for a Safety Fence at 6472 Apache Drive, Indian Head Park.*

Chairman Schermerhorn noted that a ***"Zoning Petition for a Variation for a Safety Fence"*** was filed previously by Mr. & Mrs. Michael Pall, the owners of the property, regarding a request for a variance from **Title 17, Zoning,** of the Municipal Code to allow for the construction of a safety fence at 6472 Apache Drive. Chairman Schermerhorn noted the following exhibits that are part of the public hearing this evening before the Commission: (1) a written request from the petitioner's counsel dated September 11, 2007 asking the Planning and Zoning Commission to consider a request for a proposed safety fence at 6472 Apache Drive; (2) a Plat of Survey of the subject property at 6472 Apache Drive showing an approximate placement of the fence; (3) a photo of the proposed style of wrought iron fence to be five-feet in height; (4) a Certificate of Publication and notice of public hearing regarding the continuation of a hearing regarding this zoning matter that appeared in the Saturday, September 22, 2007 *Suburban Life Newspaper;*(5) a copy of the letter that was sent to adjacent property owners within two-hundred feet (200') of the subject property dated September 20, 2007; (6) a letter from Lori Davis of Apache Drive, dated September 24, 2007 (read into the record of the open meeting) opposing the proposed fence, (7) a letter from Lori Davis, of Apache Drive, dated September 24, 2007 (read into the record of the

*PZC Minutes*
*October 2, 2007*

open meeting) regarding Bob Rehak, of Blackhawk Trail, and his opposition to the fence; (3) an unsigned letter from several concerned residents regarding this matter that was not made part of the public record because it was submitted anonymously.

Chairman Schermerhorn requested that anyone who wishes to make comments concerning this zoning matter to state their name and address for the record.

On behalf of Mr. & Mrs. Pall, Kenneth Kubiesa, the petitioner's counsel, stated that Mary and Michael Pall as well as their daughter Emily are present this evening with regard to the zoning matter before the Zoning Commission. Mr. Kubiesa stated that an initial zoning petition for a safety fence for the property at 6472 Apache Drive was heard before the Planning and Zoning Commission on June 3, 2007. He noted that since that time, a few modifications to the proposed plan have been made and additional evidence will be presented this evening as it relates to Mr. & Mrs. Pall's request for a fence for their daughter. Mr. Kubiesa presented the following exhibits to the Planning and Zoning Commission regarding the zoning petition before the Commission this evening: (1) a color landscape plan was presented showing the existing as well as the proposed screening that would be provided along the lot lines as well as an approximate location of the proposed fence; (2) photos of the variety of bushes that will be planted by the property owner to screen the fence; (3) two photographs of the proposed style of fence and gate; (4) a letter from Dr. Lisa Franco, from Hinsdale Pediatric Association, who supports a safety fence for her patient, Emily Pall who has Downs Syndrome; (5) a petition signed by 102 residents of Indian Head Park from various areas of the Village that states: *"we, the undersigned residents of Indian Head Park, support the aforesaid application for a backyard fence since it will promote safety for Emily Pall and the neighborhood, and not be an aesthetic detriment to the neighbors of the Village"*; (6) a letter from the Indian Head Park Police Department to Michael Pall, who requested a list of incidents when the Police Department visited his property when Emily was missing from the property (the case report information from the Police Department was provided to the Commission) and (7) a letter dated October 2, 2007 from Jennifer Ames, the Director of Special Education from LaGrange Highlands School District 106 where Emily Pall attends School. Mr. Kubiesa stated that Jennifer Ames is present this evening and will discuss Emily's medical condition. Chairman Dennis Schermerhorn read a letter into the record dated October 1, 2007 from Dr. Lisa Franco, Emily's pediatrician since birth. The following letter was read in part: *"Emily Pall has Trisomy 21 (known as Downs Syndrome) with other related impairments. Emily is in Special Education classes and attends various therapy sessions to assist her impairments. I believe it would be in Emily's best interest to be allowed to play in her yard. She is unable to make appropriate decisions in regards to her safety and I believe Emily requires the boundaries of her environment to be safely designated by a fence. I strongly believe this is a safety issue for Emily and should be considered for her personal welfare. Sincerely, Lisa A. Franco, M.D., Hinsdale Pediatric Association"*.

Page -3-

*PZC Minutes*
*October 2, 2007*

Chairman Schermerhorn noted the following letter from Jennifer Ames, Director of Special Education at LaGrange Highlands School District 106: *"Dear Zoning and Planning Commission, the intent of my letter is to provide you with important and relevant information regarding Emily Pall's cognitive and adaptive skill functioning. Emily presents with a medical diagnosis of Down Syndrome. She is receiving special education services under the eligibility of the disability Cognitive Delay. Based on her recent psychological evaluation, Emily meets the DSM-IV criteria for mental retardation; significantly sub-average intellectual functioning; concurrent deficits in adaptive functioning. Her individual educational plan provides her with the support of resource service, speech/language, occupational and physical therapies and a one to one paraeducator. Emily's daily living skills, communication, problem solving and socialization skills are estimated to be within the range of a 3 year old child. She does not understand rules or boundaries that are expected of a child her age. It has been documented that at school Emily has to be monitored carefully to insure her safety. It is evident that her disability is interfering with her ability to learn and function independently. Accommodations such as providing structure, limits and physical boundaries such as fences in outside yards are necessary to allow her access to major life activities such as age appropriate outdoor play as well as to insure her safety, health and well being. It is my belief that to deny her a fenced yard home environment is discriminatory in nature. Sincerely, Jennifer Ames, Director of Special Education, District 106."*

Mr. Michael Pall, the property owner of 6472 Apache Drive, stated that he took pictures of his property in the rear yard to show the existing screening in the backyard of the property. He noted that the neighbors to the east of the property have existing 6' in height bushes that extend the full length of side of the property boundaries. Mr. Pall stated that there is a small 7' gap in the bushes between the properties that would be filled in and the southern boundary of the property would need shrubbery for screening because it is very open. He further noted that there are existing bushes on the west end of the property with a few small openings. Mr. Pall stated that a gate for the fence is also proposed. Mr. Kubiesa, the petitioner's counsel, asked Mr. Pall what type of shrubbery would be planted to screen the fence. Mr. Pall stated that Arbor Vitae evergreens or a similar variety would be planted with a height of about five-feet (5') at the time of planting. Mr. Kubiesa asked Mr. Pall to describe the type of fence that would be installed. Mr. Pall stated that a black wrought iron fence with alternating spear point pickets approximately five-feet in height is being proposed instead of a flat top of the fence so that Emily cannot climb over the fence and leave the property. Mr. Pall stated that Emily is very high functioning and a very active little girl that does not understand danger. He further stated that Emily on a few occasions has opened the lock systems within the house and left the property.

Mr. Pall stated that when first moving to the new house on Apache, the cleaning crews left the house open and Emily left the home and entered one of the neighbor's homes next door.

*PZC Minutes*
*October 2, 2007*

Jennifer Ames, Director of Special Education, for LaGrange Highland School District #106, stated that she has been involved with education for over twenty-five (25) years, she has worked with children with various disabilities and Emily has been a student at the Highlands for two years. Jennifer Ames stated that she is primarily interested in providing the best environment both in school and also in the community. She noted that District 106 is an inclusive school district in that children with disabilities are best served within the regular education environment and it would be beneficial to Emily to be able to continue that environment within the neighborhood that would promote her well being. Jennifer Ames stated that it is important for a child to be able to play outside to have free realm to explore their environment, to have social engagement with other children and especially for Emily to be able to develop her motor skills. Jennifer Ames stated that Emily requires therapy at school to help her meet her potential, she is gifted in many ways and even at school Emily may try to wander off when other children are going in another direction. Mr. Kubiesa, Mr. & Mrs. Pall's counsel, asked how a fenced in yard would help Emily with the quality of life and her safety. Jennifer Ames stated that a fenced yard would provide structure for Emily with a definitive outline setting forth how far she can go because Emily needs to have a physical barrier. Jennifer Ames stated that the first priority of a school is to provide a safe environment and then you talk about enriching learning. She added that the first priority of a government is to provide a safe environment as well then enhance the quality of life. Jennifer Ames stated that she deals with special education law and the disabilities act every day and it would be discriminatory to not allow parents to provide a safe environment for Emily's well being. She added that it would seem to be the analogy of if an elderly person in a wheel chair were not able to get into their front door of their home because they are not allowed to build a ramp. Jennifer Ames stated that Emily needs social relationships with other children and communication as well as motor skills can be enhanced with free play outside.

Commissioner Costelloe asked Mr. & Mrs. Pall if they had a fence on their previous property on Blackhawk Trail. Mr. Pall stated that there was a fence around the perimeter of the in-ground pool area at the home on Blackhawk Trail. He noted that the in-ground pool was not used due to Emily's safety. Commissioner O'Malley stated that he has concerns with the proposed style of fence due to the spear points on the top sections of the fence. He asked if the Highlands School District would allow a fence with spear points at the top. Jennifer Ames stated no. Ms. Ames further stated that this type of fence would be a natural consequence for Emily and it would be a deterrent so she does not try to climb over the fence. Commissioner O'Malley stated that he is a former teacher and coach who worked at Oak Park River-Forest High School and the school had spikes around the top of the fence at the athletic facility. He noted that a young man once climbed the fence and was speared by the points on the fence and would hate to see that happen to Mr. & Mrs. Pall's daughter.

Commissioner O'Malley asked if someone would be with Emily at all times while she is in the fenced in yard. Mrs. Pall stated that Emily will never be alone. Commissioner O'Malley asked why a fence is needed if Emily is not left alone.

*PZC Minutes*
*October 2, 2007*

Jennifer Ames stated that all parents understand that when a child reaches a certain age a parent can leave a child alone safety for a few minutes at a time. Mrs. Pall stated that Emily goes to the park and plays with other children and a fence will not take the place of a parent.

Commissioner Costelloe stated that Mr. & Mrs. Pall bought a home in Indian Head Park where no fences are permitted and there was prior knowledge from living in the community on Blackhawk Trail for ten years. Kenneth Kubiesa, Mr. & Mrs. Pall's counsel, stated that the ordinance does not say no fences but that clearly safety fences are allowed and this particular purpose may not be specifically defined but the proposed fence is for safety. Commissioner Andrews stated that the Village requires a fence to provide safety around in-ground pools, that is why it is called a safety fence and there are certain other fences that are grand-fathered in and permitted. Commissioner Andrews asked if the proposed fence is specifically for Emily to play in the backyard at her home. She noted that the term "inclusion" in the school means to allow children to play at school and in the community in other environments. Mr. Pall stated that there are times when Emily may play in their yard and other times when she may play in other children's yards or in a playground but someone will always be with Emily. Commissioner Andrews referred to the Plat of Survey for the property at 6472 Apache Drive that was presented to the Commission and inquired if the landscaping shown on the plan on the east side of the property is on the Pall property boundary. Mr. Pall stated that the existing landscaping shown on the east property boundary is on the neighbors property. Commissioner Andrews stated if the neighbor to the east removed the existing bushes there would be no screening of the fence which is close to the lot line. Commissioner Andrews stated that complete screening has been required for any safety fences installed for in-ground pools and that does not include any existing landscaping that may be in place on a neighbors property.

Chairman Schermerhorn inquired if any other alternatives have been considered other than a fence such as a wrist band that may send a signal if a boundary is crossed. Mrs. Pall stated that it is a great idea for people that are not very active but an active child might take the bracelet off, other ideas were explored and a fence is the best option for Emily. Chairman Schermerhorn stated that he heard this evening from Jennifer Ames, a Special Education Director, that the fence is required because it demonstrates physical boundaries. He asked how boundaries are identified outside of the home. Mr. Pall stated that close supervision and parental care is always needed to insure Emily's safety.

Gene Callahan, of Apache Drive, stated that he and his wife have lived on Apache Drive for twenty-nine (29) years and some of the residents on Apache have asked him to present the questions they have to the Commission. Mr. Callahan presented two letters to the Commission. For the record, Chairman Schermerhorn stated that a letter was received from Barbara Clarke, of Pontiac Drive, dated September 25, 2007. The letter states in part: *"I am a parent of a severely disabled daughter and have lived in Indian Head Park for thirty-two (32) years.*

*PZC Minutes*
*October 2, 2007*

*I have never asked for a variance for a fence for my property because of my handicapped daughter for the following reasons: (1) there would be no need for one because I would never leave her alone in my yard; (2) the Village of Indian Head Park has generously provided for the handicapped in its participation in S.E.A.S.PA.R. for many years. I strongly object to a fence variance for the following reasons: in all the years I have lived here and also worked on the Zoning Board, I believe there has only been one fence variance granted and that was a large lot in the Burr Ridge area where none of the surrounding neighbors objected to it; I am sure that most residents would prefer to keep the open space quality that has brought us to purchase in this area. The proposed fence is in an area where the lots are smaller than most and would truly detract from the open space quality; a variance should never be granted where surrounding, contiguous neighbors object to it and other families in Indian Head Park who have handicapped family members have never requested a fence variance."* (read into the record of the open meeting). Chairman Schermerhorn noted the following letter from Judith Matton, of Big Bear Drive, that states in part: *"We have a severely retarded microcephalic son, who has no speech, is mobile and not high-functioning. Our caring neighbors are fabulous when/if Chris occasionally wanders. As the mother of a disabled child, I am (and our wonderful neighbors) are opposed to this fence with certainty, there is no discriminating against Mr. & Mrs. Pall's daughter. As a resident of 21 years, the ordinance should stand."* (read into the record of the open meeting).

Gene Callahan stated that most of the residents in the audience this evening have lived in Indian Head Park twenty years or more. He added that Indian Head Park is a wonderful, strong cooperative supporting each other in good times and bad. Gene Callahan stated that the personal attacks on the neighbors who oppose the fence is totally out of line and there are wonderful people who live next to this property. Mr. Callahan stated that when the petitioners first filed their request for a fence they were already residents in the community for ten years and they therefore knew there was a no fence ordinance. He added that it is obvious that safety fences are intended to keep children out of swimming pools. Mr. Callahan pointed out that a five-foot wrought iron fence with sharp points on the top is not safe for a child. He added that a ten-year old child in Chicago was fatally injured on a similar fence. Mr. Callahan stated that on June 5, 2007 the Planning and Zoning Commission unanimously voted the fence petition down and that was nine days prior to the Pall's purchasing their home on Apache Drive; therefore, the owners knew at the time when they signed the contract there were no contingencies. Mr. Callahan stated that Mr. & Mrs. Pall stated the fence was for their daughter's safety, even when the Commission did not find in their favor they purchased the home anyway and the Commission reviewed the Findings of Fact and the criteria was not met at that time.

Gene Callahan stated the law strongly supports that you cannot create a situation that requires a variance. He added that the petitioner created the problem, they should not have purchased the home in Indian Head Park if a fence was required and there are other neighboring communities that allow fences within the same school district.

*PZC Minutes*
*October 2, 2007*

Mr. Callahan stated that the neighbors in Indian Head Park are all wonderful people and the personal attack by a person from Chicago who commented on this zoning matter in the newspaper that called some residents "heartless, uncompassionate people" is totally untrue. He added that Mr. & Mrs. Davis have been wonderful neighbors and when he lost his daughter three years ago to breast cancer, the Davis family was there to help. Mr. Callahan stated that any time someone gets sick in the neighborhood whether it is good news or bad news, there is a community effect to keep everyone connected. He added that many children were raised in the neighborhood and were allowed to run freely to play through the yards. Mr. Callahan stated that under the law the courts consider the feelings of the neighbors surrounding the home and he presented an exhibit to the Commission that reflects all of the households in the immediate area that have either signed a petition against a fence or expressed their opposition. Mr. Callahan further stated that the personal attacks and negative newspaper articles put a wound in this community that may never heal, there is no need for those types of comments, he hopes the petitioner withdraws their request for a fence and the proposed wrought iron fence with sharp points is not safe.

Mr. Klaczynski stated that he and his wife Carmen have lived on Big Bear Drive for about 2 ½ years. He added that he agrees with Mr. Callahan that Indian Head Park is a wonderful place. Mr. Klaczynski stated that if the Pall's needed a fence for an in-ground pool they would have the right to have a safety fence because of a pool. He added that Mr. & Mrs. Pall have a Downs Syndrome child and  everyone is here this evening arguing about whether the property owner can have a fence that will help them keep their child safe. Mr. Klaczynski stated that there are different levels of afflictions that allow people to do things that others cannot do and a fence will help the Pall family to keep their child safe. He added that the Pall's are trying to provide the best environment for their daughter's safety and the decision should be no different than a fence granted for an in-ground pool.

Mr. Kyzivat, stated that he and his wife Sharon live on Stonehearth in Acacia. He added that a fence is not an option when in-ground pools are installed, they are required for safety. Mr. Kyzivat stated that a fence for a pool is different than a fence for safety. He added that if a child does not understand barriers, a child will not stay in the backyard even with a fence unless someone is there to watch the child. Mr. Kyzivat stated that government is not responsible for making sure children are safe at home. Mrs. Chessare, of Indian Head Court, stated that there should be no comparison to a fence for a pool that must be installed in close proximity to the pool in a small area and the proposed fence is a boundary fence around the entire property. Mrs. Scheer, of Hiawatha Lane, stated that she has six children ranging from the age of 12 to 21. She added that it is impossible for any parent to watch their child every minute of every day and the demographics in Indian Head Park are totally different today than they were four years ago.

Mrs. Scheer stated that she has a daughter Emily's age that would love to play with Emily but there is no fence to keep Emily safe. She added if the Pall's yard was fenced the children could play together.

Mrs. Guardino, of Thunderbird Drive, stated she and her husband have lived in the Village ten years and the entire Village would like to do what is right for Emily and to welcome her to the neighborhood. Mrs. Guardino asked why Mr. & Mrs. Pall purchased a home in Indian Head Park when they knew that fences were not allowed when Western Springs and LaGrange Highlands allow fences and both communities are within the same school district. Mrs. Guardino stated that Mr. & Mrs. Pall lived on Blackhawk Trail for ten years and certainly knew that fences were not permitted. Cathy Cihak, of 6517 Blackhawk Trail, stated that her backyard is Wolf Road, she has lived in Indian Head Park since 1971, she raised two children along a busy street without fences and children with disabilities need one-on-one contact and supervision.

Chris Metz, of Arrowhead Court, stated that he knows Emily who plays with his daughter that also has some developmental delays. Mr. Metz stated that his daughter understands boundaries but Emily has different needs, she has Downs Syndrome and does not understand boundaries. He added that this issue is all about Emily's safety and not about neighbors being divisive and the Board has not formally turned down the Pall's fence request. Jim Pouba, of Blackhawk Trail, stated that in any community if any family member needed help to provide a fence for the safety of their child, he hoped that it would be considered for the safety of a child it would not destroy the beauty of Indian Head Park. Greg Abbott, of Apache Drive, stated that he was a resident of Indian Head Park from 1976 to 2000. He stated that he moved away from the community and now has a family but if one of his children needed a fence for safety, he would certainly not buy a home in a community that did not allow fences. Mindy McMahon, of Blackhawk Trail, stated that she was neighbors with the Pall's for about ten years when they lived on Blackhawk Trail and on numerous occasions Emily left the home and everyone was looking for her in the neighborhood including the Indian Head Park Police Department. Mrs. McMahon stated that Emily is an active first grade Downs Syndrome child that needs to be safe within her own property boundary and she supports the request for a safety fence. She added that there was a mention of a zoning request recently for an elevator addition to a residence to accommodate a special needs child and that request was granted by the Board. Mrs. McMahon stated that she hopes there are exceptions that are made for the safety of a child to allow for a fence for Emily. Lori Davis, of Apache Drive, stated that she is a neighbor directly next door to the Pall's and the bushes along her property boundary will soon have no leaves during the fall. Mrs. Davis stated that the definition of a safety fence has changed because before it was to keep the community safe for swimming pools and now the Pall's are defining the safety fence to keep Emily safe. She added that a precedence will be established if the fence is granted. Laura Vesecky, of Big Bear Drive, stated that she concurs with the statements made by Lori Davis.

Frank Faron, President of the Indian Head Park Homeowners Association, stated that the Association members discussed this issue at the last meeting and the consensus of the members are against a fence. Mr. Faron further stated that if a fence is allowed, it should only be for a short period of time during the time the Pall's live there and not to allow a fence after the owners may sell the property.

Harry Abbott, of Apache Drive, stated that the property owners were well aware that fences were not permitted and if a fence was that important to them, they should have purchased a home in a community that allows fences. Dr. Arnold Messmore, Commissioner of Lyons Township Mental Health, stated that he presently lives at 111 Acacia Drive, he previously lived on Big Bear Drive and has no interest in whether the property is beautified with landscaping. He noted that the primary focus should be on Emily and her safety and he pointed out that there are several programs available to children with Downs Syndrome as well as other disabilities and these programs are funded specifically to provide services and activities for children with disabilities. Dr. Messmore stated that he also had a child with a disability and did not ask for a fence, the property owner knew their child has special needs and the property owner was aware that Indian Head Park did not allow fences.

Chairman Schermerhorn stated that Richard Ramello, Village Counsel, has been kind enough to sit in on the meeting this evening and he has developed some questions for the property owner and their counsel. Richard Ramello, asked Mr. Kubiesa, Mr. & Mrs. Pall's Counsel, to direct some comments to *Section 17.24.060 (e), of the Municipal Code,* which are the standards for zoning variations that are applicable. Kenneth Kubiesa stated that he does not believe that the standards for zoning variations apply to this proceeding because this is not a variation but a proceeding for the issuance of a fence permit. Mr. Kubiesa referenced the following section of the Municipal Code, specifically *17.12.120*, which states in part: ***"fences are prohibited except as follows: (a) those required for safety as determined and upon such terms and conditions as may be imposed following the procedures for variation in this title".*** He noted that the reference does not specifically mention the standards for variations but procedures for variations and the only standard is that the fence is required for safety. Mr. Kubiesa stated that there is no contrary evidence that the fence is not required for safety. Richard Ramello asked Mr. Kubiesa why he believes that the standards for variations under *Section 17.24.060*, is not a procedural rule. Mr. Kubiesa stated that it is a substantive rule and the procedure is having the public hearing, putting the notice in the newspaper and conducing the hearing in accordance with those procedural standards not substantive. Mr. Ramello stated that the purpose of the hearing is to determine whether or not based on the evidence produced at the hearing if those standards have been met. Mr. Kubiesa stated that the standards for *Section 17.12.120 (a)* have been met. Mr. Ramello asked Mr. Kubiesa why the standards of Section 17.24.060 (e) would not apply because in order to grant the variation the standards must be met. Mr. Kubiesa stated that the zoning standards are not procedures.

*PZC Minutes*
*October 2, 2007*

Mr. Ramello asked Mr. Kubiesa if he believes there is some exception in another section of the Indian Head Park Zoning Code that stated in the instance of a fence variation that the standards of **Section 17.24.060** would not be applicable. Mr. Kubiesa stated that the standards of the zoning code does not apply. Mr. Ramello stated that the standards do apply and are standards for variations. He further stated that it is the petitioner's burden to enter into the record the evidence necessary to show that those standards have been met. Mr. Kubiesa stated that he does not have any evidence to enter other than what has been presented because the standards do not apply.

Mr. Ramello asked Mr. Kubiesa if his clients have considered any other alternatives other than the fence that is proposed. Mrs. Pall stated that the reason for a five-foot in height fence for Emily is that generally Downs Syndrome children do not grow taller than approximately four feet and a five-foot fence is needed. Mrs. Pall further stated that she has agreed to all of the landscape requirements that have been suggested by the Commission. Mr. Ramello asked Mr. & Mrs. Pall if there explored the possibility of wireless technology with an infrared beam and wireless fences that would sound an alarm if that beam is broken. Mrs. Pall stated that she is familiar with the wireless technology and they have some security measures in place in the home already but is not in favor of infrared rays and would be concerned with effects it might cause to a child. Jennifer Ames, Director of Special Education at Highlands School District, stated that Emily needs both visual and physical boundaries. Mrs. Pall stated that various alternatives other than a physical fence were considered and those concepts were rejected for various reasons. Mr. Ramello asked Mr. & Mrs. Pall if they considered fencing a smaller section of the rear yard as opposed to the entire boundary of the lot. Mr. Kubiesa stated that the Pall's could consider that option but that it has not been suggested. Commissioner Andrews pointed out that the Planning and Zoning Commission made a suggestion to fence a smaller section of the yard and Mrs. Pall rejected that concept at the last zoning meeting. Mr. Ramello asked the petitioner if it would be a reasonable proposal to fence a smaller area of the yard. Mrs. Pall stated that she would be agreeable to a smaller section of the lot to be fenced but not just the patio area which is a fairly small area. Mr. Ramello asked the petitioners if the Planning and Zoning Commission were to recommend granting a fence and the Village Board were to approve a fence, would they be agreeable to remove the fence upon Emily no longer residing at this residence. Mr. Pall stated that he has no objection in removing the fence under those circumstances. Mr. Ramello asked Counsel Kubiesa if his clients would be willing to back up that agreement with a performance bond to guarantee and insure that the fence would be removed when there is no longer a need for the fence. Mr. Kubiesa stated that the terms of an agreement can be effectuated to allow for a fence.

Chairman Schermerhorn stated that several members of the audience asked why the petitioners moved to Indian Head Park knowing a fence was needed for their child and there may be some animosity because fences are generally not permitted. Mr. Pall stated that he believes there is a provision in the ordinance that allows for safety fences.

*PZC Minutes*
*October 2, 2007*

Gene Callahan, stated that he is an attorney by profession, he is familiar with zoning law and asked if the current discussion is leaning towards a zoning special use that would be in a totally different section of the code. He noted that the petitioners did not meet the zoning standards at the previous hearing.

Mr. Callahan asked if special use provisions are being made for this property. He stated that the consensus of the neighbors in the audience is that the Commission will take a vote this evening to provide a recommendation to the Board on this matter instead of continuing the matter again. Chairman Schermerhorn stated that the Commission in its advisory capacity hopes to take a vote this evening to provide a recommendation to the Village Board at the next meeting.

Frank Lesh, of Indian Head Court, stated he has lived in Indian Head Park for many years, that the safety of Emily is critical to everyone but why not consider Arbor Vitae bushes to line the entire property boundary to provide a physical barrier that stays green all year. Mr. Lesh stated that he works outdoors as part of his job, evergreen bushes are not pleasant to walk through and a child would learn not to cross that boundary.

Mr. Kubiesa, Mr. & Mrs. Pall's counsel, stated that Emily is a unique child and the parents are doing all they can to provide for her safety by trying to receive approval for a fence. Mr. Kubiesa stated that a few laws apply regarding this matter. He noted that the Americans with Disabilities Act allows for a reasonable accommodation in Emily's circumstances by this Village and there is no evidence that suggests or outweighs the safety of Emily. He added that Emily's medical record is clear that she is disabled and the request before the Commission is certainly reasonable. Richard Ramello, Village Counsel, stated that in addition to the Americans with Disabilities Act, there is also a Federal Statute that mirrors the Americans with Disabilities Act called the Fair Housing Amendment Act and he noted that both of these references apply to zoning type situations. Mr. Ramello stated that in an instance where a person has a disability, such as a person with Downs Syndrome, if the strict letter of the law does not provide for the needs of that particular person with a disability, the Village must make some reasonable accommodation to provide for an equal living environment for that person with a disability. Mr. Ramello further stated that the requested accommodation must be a reasonable accommodation and that determination of being reasonable is on a case by case situation and there is no particular standard other than the evidence that is provided before a zoning board by the petitioner. He noted that the accommodation cannot cause an undue burden or expense on the local government or one that creates a fundamental alteration in the Village's zoning scheme and that type of accommodation would be deemed unreasonable.

Mr. Ramello stated that reasonable alternative accommodation if the fence variation is denied, can and have been held up in courts on a case by case determination. He noted that there is one particular case in which the petitioners had requested a front yard fence variation, which was denied and the Village had suggested a different fence configuration of a rear and side yard

*PZC Minutes*
*October 2, 2007*

alternative and the court found that alternative to be a reasonable accommodation. Gene Callahan, of Apache Drive, stated that in the particular court case mentioned, that Village also allowed fences and had fences standards in place and the issue was the fence in the front yard of the property. Mrs. Scheer inquired when the fence regulations were established because there are some fences existing in the Village.

Chairman Schermerhorn stated that the ordinance regarding fences was enacted in 1964. Chairman Schermerhorn stated that there is a petition before the Commission this evening in which the petitioner is requesting to fence the entire backyard of a property at 6472 Apache Drive. He noted that the standards as defined in the Village's Zoning Ordinance, *Section 17.24.060*, do in fact apply to this zoning request and the Commission will be reviewing those standards as it relates to this zoning petition for a fence.

Chairman Schermerhorn further noted that the Commission will also review whether there are alternatives or conditions that would be appropriate to bring to the attention of the Village Board as it relates to this zoning matter. Chairman Schermerhorn noted that the audience has provided public input on this zoning matter and the Commission will review the Findings of Fact as it relates to this zoning request. Chairman Schermerhorn entertained a motion to accept the zoning petition for a fence for the property located at 6472 Apache Drive, as presented to the Commission. Commissioner O'Malley moved, seconded by Commissioner Andrews, to accept the zoning petition as presented to the Commission. A voice vote was entered into the record.

*Aye:    Commissioners Andrews, Costelloe, O'Malley, Yelnick*
*Nay:    None*
*Absent: Ingram*

Chairman Schermerhorn and the Commission members reviewed the following Findings of Fact with regard to the residential property at 6472 Apache Drive to evaluate evidence presented in response to the following criteria before recommending a variation(s), as required by the Village's Zoning Ordinance, ***Title 17 Zoning, Section 17.23.060E***: (1) that the property in question cannot yield a reasonable return if permitted to be used only under the conditions allowed by the regulations governing the district in which it is located (not applicable -- this reference pertains only to commercial properties); (2) the plight of the owner is due to unusual circumstances (all commissioners agree); (3) the variation, if granted, will not alter the essential character of the locality (all commissioners disagree); (4) the particular physical surroundings, shape or topographical conditions of the specific property involved would bring a particular hardship upon the owner as distinguished from a mere inconvenience if the strict letter of the regulation were to be carried out (the Commission members noted -- not applicable because the topographical conditions and geography is not relevant to this zoning request for a fence); (5) the conditions upon which the petition for variation is based would not be applicable generally to other property within the same zoning classification (all commissioners disagree) (6) the purpose

*PZC Minutes*
*October 2, 2007*

of the variation is not based exclusively upon a desire to make money out of the property (all commissioners agree); (7) the alleged difficulty or hardship has not been created by any person presently having an interest in the property (all commissioners disagree);(8) the granting of the variation will not be detrimental to the public welfare or injurious to other property or improvements in the neighborhood in which the property is located (all commissioners disagree); (9) the proposed variation will not impair an adequate supply of light and air to adjacent property, or substantially increase the danger of fire, or otherwise endanger the public safety, or substantially diminish or impair property values within the neighborhood (all commissioners disagree).

Commissioner O'Malley moved, seconded by Commissioner Andrews, to accept the findings of fact with regard to the zoning matter before the Planning and Zoning Commission this evening. Motion carried by unanimous roll call vote (4/0/1).

*Aye:    Commissioners Andrews, Costelloe, O'Malley, Yelnick*
*Nay:    None*
*Absent: Ingram*

Chairman Schermerhorn stated that the Planning and Zoning Commission has reviewed the Findings of Fact as required by the Village's Zoning Ordinance as it relates to this zoning matter. Chairman Schermerhorn asked if there are alternatives that could be explored to be included in the recommendation to the Village Board. Chairman Schermerhorn stated that  Mr. & Mrs. Pall have presented their petition as a safety fence to create a boundary for Emily's safety and it was stated by Mr. & Mrs. Pall that Emily would not be left unattended in the yard for any length of time. Mrs. Pall stated that Emily has the right to play outside with other children, the only way that can happen is if there is a safe boundary with a fence and the style of fence that was selected is similar to the style of fence in Western Springs at the Dartmoor Development. Jennifer Ames, Special Education Director for LaGrange Highlands School, stated that the point is to make an accommodation to allow Emily to access major life functions such as learning and socializing through playing as a child. Chairman Schermerhorn stated that the proposed petition is to fence an entire yard, the Commission is trying to determine an accommodation if possibly a portion of the rear yard could fenced so that it is not so objectionable to the rest of the residents in the immediate area while still accommodating Emily's safety. He noted that a fence is not intended to provide a total learning experience because there are other programs and activities that provide that for Emily. Mrs. Pall stated that a trampoline in her yard would not be attractive to the neighbors, a fence is being requested for Emily's safety, it will not diminish property values in the area, there are no parks or libraries in the Village and the school district is very good and the reason why her family moved to Indian Head Park. Mrs. Pall stated that she is in charge of the National Association of Downs Syndrome Fashion Show Fundraisers on an annual basis and so much has been given back to the community.

Commissioner Jack Yelnick stated that he has a friend with a child who has special needs and can certainly appreciate the safety of a child, he was not present at the prior zoning meeting regarding this matter and he added that the comments both for and against the requested zoning relief for a fence is appreciated.

Commissioner Yelnick further stated that when someone comes into a community knowing that fences are not permitted and then asks for a fence, it is not fair to the rest of the community who have followed the rules of the Village. However, he noted that if the property owner was unaware or misunderstood the fence regulations, a fence for safety could be considered conditioned that the fence would be removed prior to the sale of the home or if it is determined the fence at some point the fence is no longer needed for the child. Mr. Pall stated that he is more than willing to work with the Commission and he asked if Emily was born in that house, would it affect the decision to allow for a fence. Commissioner Yelnick stated that he certainly has compassion for this situation and is only trying to find a solution where all parties can agree while respecting the needs of the petitioner as well as respecting the neighbors who have lived in the community for many years.

Commissioner Costelloe stated that one of many contributing factors in this matter is that the petitioner lived on Blackhawk Trail for ten years before purchasing the home on Apache and the petitioner was aware of the fence regulations because they had a fence around an-ground pool at that property on Blackhawk Trail. Mr. Kubiesa stated that if there is some objection to the proposed fence because it is too close to the lot line, or the fence is unattractive to the neighbors, those issues can be dealt with to reach a solution. He noted that if the objection is that fences are not allowed because that is how it has always been, the petitioner cannot compromise on that issue. Mr. Kubiesa further stated that if the Commission can state what is objectionable a compromise can possibly be reached such as the design of the fence, or propose a fence that is less visible or more visible, move the location of the fence or plant bigger shrubs to screen the fence. Chairman Schermerhorn stated that there is a no fence ordinance in Indian Head Park, the petitioner moved into a Village knowing fences are not permitted and the Commission is now trying to find an accommodation for Emily's safety. Chairman Schermerhorn stated that the petition presented shows an entire backyard that would be fenced and the petitioner mentioned using a portion of the neighbors existing foliage that loses it leaves to screen their fence along one boundary. Chairman Schermerhorm stated that there were comments this evening that the Village allows fences for pools and some residents asked what is the difference. He noted that fences are required to screen in-ground pools, the fence for pools must be installed in close proximity of the pool not the entire property boundary and screening is required.

Chairman Schermerhorn asked Mr. & Mrs. Pall's counsel if a smaller area to be fenced would be acceptable. He noted that most people moving to the community are aware that installation of fences are not permitted and in some cases that is the reason someone may move to Indian Head Park.

Chairman Schermerhorn stated that he is not in favor of a fence that would be visible from the front of the house and the fence should start and end at the sides of the house and not extend into the entire rear yard of the property. Mrs. Pall stated that the rear yard is very small. Mr. Kubiesa asked what the Commission is suggesting so that a solution for the fence can be considered.

Chairman Schermerhorn stated that the point is clear that the fence should not extend beyond the side boundaries of the building and into the entire rear yard of the property and a compromise needs to be reached in order to provide a recommendation to the Village Board. Mr. Pall stated that on the west side of the property there is only seven-feet (7') between where the existing bushes end and the house, the house is on a hill with a grade and the fence would not be visible because bushes would be planted for screening. Chairman Schermerhorn stated that the petitioners are not making any accommodations to the neighbors. Mr. Pall stated that the fence will not be visible from the street and if the concern is that the fence should only be the width of the house he is not totally opposed to idea. Chairman Schermerhorn stated that the Commission has not granted a fence to enclose an entire yard and asked the petitioner if they are agreeable to a smaller area of the property to be fenced.

Mr. Pall stated that if people do not want a fence, will it change their conception of the fence if it is a smaller fence. Commissioner Costelloe stated that the reason for the no fence rule is to maintain a park-like atmosphere in the community and if the enclosed area is closer to the home, it is less of an encroachment and more open area will be maintained. Commissioner Costelloe pointed that the Commission is trying to reach a balance to address everyone's concerns. Chairman Schermerhorn asked Mr. & Mrs. Pall is they agreed to removing the fence if Emily no longer needs the fence. Mrs. Pall stated that there will always be a need for the fence although she is not opposed to the Board reviewing the need for the fence on a yearly basis. Chairman Schermerhorn stated that if the Village Board were to grant an ordinance to allow the fence, would Mr. & Mrs. Pall allow for the ordinance to be recorded against the property. Mr. Kubiesa inquired if the Commission is asking for the ordinance to be recorded against the property to restrict the property to conditions set forth with regard to the fence. Chairman Schermerhorn responded, yes. Mr. Kubiesa stated that he is not opposed to an agreement being recorded for the subject property as it relates to conditions with regard to the fence. Chairman Schermerhorn asked Mr. Kubiesa if there were any objections to the petitioner posting a performance bond with the Village to insure the removal of the fence. Mr. Kubiesa stated that he is willing to discuss other guarantees with Village counsel but not necessarily a performance bond. Chairman Schermerhorn stated that the fence would need to be completely screened on the property. Mr. Kubiesa stated there are no objections to provide screening.

Chairman Schermerhorn entertained a motion to present a recommendation to the Village Board to accept Petition #162 for a fence as presented to the Commission. Commissioner O'Malley moved, seconded by Commissioner Yelnick, to accept the petition for a fence for 6472 Apache

*PZC Minutes*
*October 2, 2007*

Drive, as presented to the Commission at the meeting this evening. A roll call vote took place as follows: (0/4/1).

*Aye:    None*
*Nay:    Commissioners Andrews, Costelloe, O'Malley, Yelnick*
*Absent: Ingram*

Chairman Schermerhorn entertained a motion to present a recommendation to the Village Board with regard to Petition #162 to approve a fence for the property at 6472 Apache Drive, subject to the following conditions: (1) that the fence shall not exceed the width of the residence on the east and west side of the home; (2) the fence shall not extend more than twenty-five feet (25') from the back of the house south into the rear yard setback; (3) that the fence must be screened on all sides with evergreens that do not lose their leaves; (4) that the medical necessity and need for the fence will be reviewed every two years by a medical professional; (5) that the fence will be removed when Emily no longer needs the fence or if she no longer resides at the subject property and (6) the ordinance to be recorded for the subject property and; (7) a performance bond to be posted with the Village to insure removal of the fence when there is no longer a need for the fence.

Commissioner Yelnick stated that he does not believe it to be relevant with regard to proving the medical necessity because the parents have a tough situation with Emily having Downs Syndrome and they should not have to provide proof each time the fence comes up for review. Commissioner Andrews stated that she has family members with children that have disabilities who have made tremendous progress with their medical conditions and she hopes Emily will also have progress. Commissioner Andrews stated that she agrees that the medical necessity for the fence should ne reviewed by a medical professional at least every two years. Commissioner O'Malley stated that he had some involvement with the special education department at Oak Park River Forest High School and is in favor of reviewing the medical necessity for a fence on an annual basis. Commissioner Costelloe stated that she also supports Commissioner O'Malley's position regarding a medical necessity review.

Commissioner Costelloe moved, seconded by Commissioner Andrews, to approve the fence for 6472 Apache Drive, as stated in the above conditions and to present this recommendation to the Village Board. A roll call vote took place as follows:

*Aye:    Commissioners Costelloe, O'Malley, Yelnick*
*Nay:    Commissioner Andrews*
*Absent: Ingram*

Chairman Schermerhorn stated that a report and recommendation regarding this zoning matter will be presented to the Board at the next meeting to accept the petition voted upon.

*PZC Minutes*
*October 2, 2007*

Chairman Schermerhorn stated that he hopes that the Commission has reached an accommodation with regarding to this zoning matter.

### REVIEW AND APPROVAL OF PLANNING AND ZONING COMMISSION MEETING MINUTES (DISCUSSION AND A POSSIBLE VOTE MAY TAKE PLACE)

★    *Minutes of the Planning and Zoning Commission Meeting held September 4, 2007*

Upon review of the minutes presented from the meeting held on Tuesday, September 4, 2007, Commissioner Andrews moved, seconded by Commissioner Yelnick, to approve the September 4, 2007 meeting minutes, as presented. Carried by unanimous voice vote (4/0/2).

## VI.    ADJOURNMENT

There being no further business to discuss before the Commission, Commissioner Andrews moved, seconded by Commissioner Yelnick, to adjourn the meeting at 10:30 p.m. Carried by unanimous voice vote (5/0/1).

Respectfully Submitted,
Kathy Leach, Recording Secretary
Planning and Zoning Commission

# Village of Indian Head Park
## 201 Acacia Drive
## Indian Head Park, IL 60525

## MEETING MINUTES
## BOARD OF TRUSTEES

*"Pursuant to 5 ILCS 120/2.06 (3) minutes of public meetings shall include, but need not be limited to: a general description of all matters proposed, discussed, or decided, and a record of votes taken."*

### Thursday October 11, 2007
### 7:30 P.M.

★ **CALL TO ORDER - MAYOR RICHARD ANDREWS**

The regular scheduled meeting of the Village of Indian Head Park Board of Trustees was held on Thursday, October 11, 2007, at the Municipal Facility, 201 Acacia Drive, and was called to order at 7:30 p.m. by Mayor Richard Andrews. Village Clerk Joseph Consolo called the roll as follows:

★ **ROLL CALL: JOSEPH CONSOLO, VILLAGE CLERK**

**PRESENT (AND CONSTITUTING A QUORUM):**

Mayor Richard Andrews
Trustee Debbie Anselmo
Trustee Brian T. Bailey
Trustee Anne Bermier
Trustee Carol Coleman
Trustee Norman L. Schnaufer
Trustee Matthew P. Walsh II

**ALSO PRESENT:**

Frank Alonzo, Administrator
Steve Busa, Treasurer
Joseph Consolo, Village Clerk
Richard J. Ramello, Counsel, Storino, Ramello & Durkin
Edward Santen, Water/Public Works Superintendent

★ **PLEDGE OF ALLEGIANCE TO THE FLAG**

Mayor Richard Andrews and the Board of Trustees led the audience in reciting the Pledge of Allegiance to the Flag: *"I Pledge Allegiance to the Flag of the United States of America and to the republic for which it stands, one nation under God indivisible with liberty and justice for all".*

Mayor Andrews reported that the Village received a letter from Cook County Commissioner Liz Gorman regarding a new discount prescription drug program available to residents of Cook County at no cost. He noted that the program is designed to help individuals without health insurance, those that are under-insured or plans that do not cover prescription drugs. Mayor Andrews stated that brochures regarding the program will be available at the Village offices.

★ **CONSENT AGENDA**
- *Approval of Ordinance Granting a Zoning Variation for the Property Located at 6349 Blackhawk Trail (Ordinance #07-15)*
- *Approval of Ordinance Amending Chapter 5.08 of the Municipal Code Regarding Liquor Licenses (Ordinance #07-16)*
- *Approval of an Ordinance Amending the Municipal Code by the Addition of Chapter 27, Entitled "Right-of-Way Utility Construction Regulations" of Title 15 of the Municipal Code (Ordinance #07-17)*
- *Approval of an Ordinance Authorizing the Establishment of a Line of Credit with Western Springs National Bank & Trust (Ordinance #07-18)*

Mayor Richard Andrews entertained a motion to approve the Consent Agenda items as presented with minor typographical corrections to Ordinance # 07-15 and Ordinance 07-16.

Trustee Coleman moved, seconded by Trustee Bermier, to approve the Consent Agenda items, as presented to the Board for approval. Carried by unanimous roll call vote (6/0/0).

*Aye:    Anselmo, Bailey, Bermier, Coleman, Schnaufer, Walsh*
*Nay:    None*
*Absent: None*


● **APPROVAL OF BOARD MEETING MINUTES**

   ***Minutes of the Regular Board Meeting - September 13, 2007***

After review of Board meeting minutes, Trustee Walsh moved, seconded by Trustee Bailey, to approve the September 13, 2007 regular Board meeting minutes, as presented. Carried by unanimous voice vote (6/0/0).

★ **FINANCIAL REPORT — TREASURER STEVE BUSA**
   Approval of Financial Report for the month ending September 30, 2007

Treasurer Busa presented the financial report for the month ending September 30, 2007. He noted: (1) total revenues were $113,850.55; (2) expenditures were $233,532.08 and; (3) total fund balances in all accounts at the end of September were $445,859.12.

Trustee Schnaufer moved, seconded by Trustee Anselmo, to approve the financial report for the month ending September 30, 2007, as presented by Treasurer Busa. Carried by unanimous roll call vote (6/0/0).

*Aye: Anselmo, Bailey, Bermier, Coleman, Schnaufer, Walsh*
*Nay: None*
*Absent: None*

Treasurer Busa noted for the record that the Village generally receives its portion of the real estate taxes from Cook County in October of each year; however, there are some issues to be resolved at the County and State levels before the Village can receive its portion of the real estate tax revenues. Mayor Andrews noted that the Village has established a line of credit in the event there is a shortfall of revenues due to the real estate tax bills being delayed for an extended period of time.

**ZONING AGENDA ITEMS -- (QUESTIONS AND/OR COMMENTS FROM INDIAN HEAD PARK RESIDENTS ALLOWED AFTER ZONING REPORT(S) AND PRIOR TO VOTES ON ZONING REQUESTS**

**ZONING REPORT, BOARD CONSIDERATION AND VOTE REGARDING THE FOLLOWING MATTERS**:

Mayor Andrews pointed out that the Board will receive the report this evening from Chairman Schermerhorn regarding the zoning matter before the Board this evening and time will be allowed for questions or comments from Indian Head Park residents in the audience. Mayor Andrews noted that the public hearing process was concluded by the Planning and Zoning Commission regarding Petition #162, the Board will not gather new evidence concerning this petition, an opportunity will be provided for residents to be heard on this issue and the Board will consider the modified proposal for a fence at 6472 Apache Drive as heard and voted upon by the Commission.

***Report from the Planning and Zoning Commission Regarding Petition #162 -- Continuation of a Public Hearing Regarding Terms and Conditions for a Fence at 6472 Apache Drive.***

***A. Motion to Receive Report***
***B. Discussion, Consideration and Possible Vote to Grant Relief Requested***

Chairman Dennis Schermerhorn reported that a continuation of a public hearing was held before the Planning and Zoning Commission on Tuesday, October 2, 2007 regarding Petition #162 and a revised proposal for a fence submitted by Mr. & Mrs. Michael Pall, the property owners of 6472 Apache Drive. Chairman Schermerhorn noted: (1) the Commission was presented with a revised petition requesting approval to construct a temporary safety fence on the subject property by Mr. & Mrs. Michael Pall through their attorney Kenneth Kubiesa;

(2) the request was proposed as a safety fence such as the types of fences that are permitted around swimming pools; (3) Mr. & Mrs. Pall stated that the safety fence would protect their daughter, Emily, who suffers from Downs Syndrome and pointed out that Emily has difficulty observing boundaries; (4) Mr. Pall presented his proposed design of the fence to be installed, how it would be screened and the style of fence that was selected; (5) there was testimony from Emily's special education teacher as well as a letter from Emily's doctor supporting the petition for a fence; (6) several members of the audience objected to granting a safety fence and a petition was presented to the Commission signed by 102 residents of the Village in favor of a safety fence; (7) a large audience representation spoke about maintaining the character of the community noting that the petitioners were aware that fences were not permitted before purchasing the property and that many other children with disabilities were raised in the Village without the need for a safety fence. There were concerns also expressed that a precedent might be set that would cause other new fences to be constructed in the Village, altering the character of the Village. Chairman Schermerhorn also noted there were five letters and several e-mails received opposing the fence; (8) in all, seventeen people spoke before the Commission, 4 in favor of the fence, 12 against and one person who was not specifically for or against the petition; (9) the Commission was advised by counsel on several matters arising from the petition, especially the impact of the ADA Statute. Kenneth Kubiesa, Mr. & Mrs. Pall's attorney, also stated that he believed that this was not a zoning variance issue, but a fence permit issue since safety fences were permitted under the ordinance.

Chairman Schermerhorn stated that upon hearing the testimony, reviewing the petition and evidence, the following determination was made by the Commission: The fact finding process defined by the ordinance did conflict with the petition in that 17.24.060E (c) that the petition, if granted, would alter the essential character of the community. Chairman Schermerhorn stated that having made these findings of fact, the Commission voted unanimously to recommend to the Village Board not to approve the petition, as presented. He noted that one Commission member was absent. The Commission then proceeded to develop a series of conditions to the petition, which deliberations, along with input from the petitioners resulted in the following conditions: (1) the proposed fence shall not extend beyond the building to the east or west, and may not extend out from the building to the south more than twenty-five feet (25'); (2) that the medical necessity for the fence must be reasserted by a medical professional at least every two years for the fence to remain in place; (3) that once the medical reason ceases, or Emily no longer lives in the residence, the fence must be removed; (4) that the fence must be fully screened by evergreen shrubbery; (5) that a performance bond must be posted with the Village to assure the costs of removal; (6) that the ordinance, if so approved, shall be recorded with the Cook County Recorder of Deeds. Chairman Schermerhorn stated that there was also discussion as to the safety of the fence being proposed that would be a metal fence five-feet (5') in height with pointed tops. The Commission agreed to recommend approval of the petition as modified by the above conditions with a vote by the Commission of four in favor, one opposed and one member was absent.

Mayor Richard Andrews entertained a motion to receive the report presented by Chairman Schermerhorn from the Planning and Zoning Commission with respect to Petition #162. Trustee Walsh moved, seconded by Trustee Bailey, to receive the report from the Planning and Zoning Commission regarding Petition #162 for a safety fence at 6472 Apache Drive. Carried by unanimous roll call vote (6/0/0).

*Aye:  Anselmo, Bailey, Bermier, Coleman, Schnaufer, Walsh*
*Nay: None*
*Absent: None*

Mayor Andrews asked Kenneth Kubiesa, Mr. & Mrs. Pall's counsel, if the presentation by Jennifer Ames from LaGrange Highlands School District #106 before the Planning and Zoning Commission concerning this zoning matter was presented on behalf of School District #106. Mr. Kubiesa responded, no. Mr. Kubiesa stated that Jennifer Ames was present at the last zoning meeting as Emily's teacher. Mayor Andrews stated that the petition circulated for signatures in the community was unclear as to who was circulating the petition and it almost appeared that the Planning and Zoning Commission was going door to door for signatures. Mr. Kubiesa stated that Mr. & Mrs. Pall circulated the petitions for signatures.

Gene Callahan, of 6445 Apache Drive, stated that he lives four houses away from the Pall residence. Mr. Callahan stated that he appreciates the Planning and Zoning Commission members who serve in a voluntary capacity for the Village. Mr. Callahan stated that he was asked by residents who are adjacent to the Pall property to represent the group to state the concerns of all of the neighbors as it relates to this zoning matter. Mr. Callahan further stated the following: (1) most of the residents within the two hundred feet of the subject property are unanimously opposed to the fence for the property at 6472 Apache Drive; (2) one of the issues that came out of the public hearing was that the petitioners had lived in the community on Blackhawk Trail for ten years before moving to Apache and were aware of the fence regulations; (3) on June 5th of this year the Planning/Zoning Commission voted unanimously not to approve a fence for the subject property; (4) there are two unanimous votes not to approve the fence for the property at 6472 Apache Drive; (5) Mr. & Mrs. Pall closed on their home on Apache Drive ten days after the first unanimous vote that was not in favor of granting a fence and the property owners knew at the time the petition was filed that a fence was not approved; (6) many residents at the previous meetings asked the Pall's why they bought the house when they knew they needed a fence and did not receive approval; (7) the property owners stated they wanted to stay in the area because of the school district and the Zoning Commission pointed out that there are surrounding communities adjacent to Indian Head Park within the same school district that also allow fences; (8) several suggestions were made by the Planning and Zoning Commission as well as the Village attorney yet the property owners were not willing to compromise; (9) Jennifer Ames from School District #106 stated that Emily as well as those with special needs require boundaries. However, Ms. Ames did not say Emily needed a five-foot (5') fence;

(10) the property owners are proposing a five-foot (5') fence and there were concerns from the Commission as well as some in the audience with the pointed tops on the style of fence that is being proposed; (11) there was a lengthy dialogue with the property owners about the possibility of various electronic alarm systems instead of a fence or possibly enclosing only a portion of the backyard with a fence around the patio area with a safer design on the top portion. He noted that plan was unacceptable to Mr. & Mrs. Pall and most of the suggestions were unacceptable to the property owners; (12) at one point, after three hours into the meeting, the Commission and Village Counsel as well as Mr. & Mrs. Pall and their counsel agreed to the suggestion of a fence not to extend more than twenty-five feet (25') into the rear yard, a medical certificate to be presented to the Village concerning the need for the fence and a bond to be posted with the Village; (13) the Commission voted on the compromise proposal that was agreed to and adjacent neighbors did not have an opportunity to speak on that matter. Mr. Callahan stated that he is an attorney by profession and has some experience in the area of zoning law, the purpose he is present this evening is to reiterate again that the majority of adjacent property owners are opposed to any type of fence, some of the terms set forth may not be appropriate as far as requiring a medical certificate and the group opposed to the fence in the immediate area represents about 250 people. He noted that the petitions presented by the Pall's were passed out at the local school districts and they were not from people who live in the immediate area, some of the people present from the community have children that play with the Pall children and the people that would be most affected by a fence are the people who live directly next to the Pall property. Mr. Callahan stated that letters were received from Bob Rehak, Barbara Clarke and Judy Matton all who raised children with severe disabilities without a fence. Mr. Callahan stated that if the Board classifies the special needs fence for a special needs person, there are many more individuals with parents or children to care for with learning disabilities or other physical impairments that could petition the Village for a fence. Mr. Callahan stated that a fence could not be denied for those circumstances if a fence is approved for the Pall's child because a precedence would be established. Mr. Callahan stated that Indian Head Park is a unique community that does not allow fences and the majority of the immediate property owners have lived in the community on average at least twenty-two years (22) and have raised their families in an open environment without fences.

Mr. Callahan stated that Mr. & Mrs. Pall's counsel raised some concerns with making accommodations according to the Americans with Disabilities Act (ADA). He noted that ADA stated that reasonable accommodations must be made and what Mr. & Mrs. Pall are proposing is not reasonable, granting approval for a fence under these circumstances will open up the flood gates and Indian Head Park will be the same as the surrounding communities with fences popping up all over the place. Mr. Callahan stated that he previously served on a school board at Kennedy School in Palos Park, there were twenty-one (21) children with Downs Syndrome, there never was a fence and he is not in favor of fencing Emily in her backyard. Mr. Callahan stated that on behalf of the adjacent neighbors, the consensus is not in favor of a fence being granted for the Pall property.

Lori Davis, of 6482 Apache Drive, asked if all of the Planning and Zoning Commission members as well as Board members have visited the property at 6472 Apache Drive. Mrs. Davis stated that some of the perimeter lots are 20,000 to 22,000 square feet but many of the interior lots are much smaller than many of the lots in the Village. Tim Kyzivat, of 1 Stonehearth in Acacia, stated that he attended the last zoning meeting with regard to this zoning matter and it did not seem there was much of a compromise with the property owner, and in fact, Chairman Schermerhorm offered many reasonable suggestions that were turned down by the property owner. Mr. Kyzivat stated that he has concerns with safety and liability issues if a fence is installed because it will be an attraction for children to climb the fence. Tom Davis, of 6482 Apache Drive, stated that Commissioner Jack Yelnick expressed at the zoning meeting that he was not sure if he could be impartial because he knew a child with a similar disability and he stated it was difficult for him to be objective. Mr. Davis further stated that possibly Commissioner Yelnick should have excused himself from voting on this matter. Mr. Davis stated that the Planning and Zoning Commission's purpose is not to design fences or similar structures but to listen to the pros and cons of a proposed plan and to make a recommendation to the Board. Mayor Andrews stated that he was present at the last zoning meeting as well as all of the Board members and there is no doubt about Commissioner Yelnick's objectivity, participation in the meeting or his vote on this zoning matter. He added that Commissioner Yelnick disclosed his concerns at that meeting as it related to a child with a similar disability, his vote pertained specifically to this zoning matter and there was nothing improper about his vote. Mayor Andrews stated that each member of the Board and Commission is also a resident of the community and some day they may be called upon to cast a vote on a matter in a variation process that affects a neighbor. Mayor Andrews pointed out that the  Village at one time had a Zoning Board of Appeals and a Planning Commission. He noted that the Zoning Board of Appeals was dissolved in 1991 and a Planning and Zoning Commission, comprised of seven members, was created at that time for the purpose of serving in both a planning function and a zoning board function. Mayor Andrews stated that when a petitioner approaches the Village to seek zoning relief for a room addition or other variation, the goal is to help residents and it would be a disservice to the community to deny a zoning request by telling someone you cannot have it without providing any other input. Mayor Andrews stated that the input received from the Planning and Zoning Commission is appreciated by the entire Board.

Chris Metz, of 6403 Arrowhead Court, stated that he recalled that Mr. & Mrs. Pall stated that they would select a style of fence without spikes on the top. He added that the issue is a matter of safety for Emily and Mr. & Mrs. Pall have a need for a fence to provide a safe environment for their daughter. Mr. Metz further stated that comments were made this evening that there will be many others who might request a fence and if they can establish a need for fence it should be granted to those individuals also, Emily was born in this town and he urged the Board to approve the safety fence for Emily. Mr. Metz stated that fencing twenty-five feet (25') of the property out from the back of the house instead of the entire yard does not make sense because the fence will not be visible and will be screened with shrubbery.

Fran Pettersen, of 6428 Mohawk Court, stated that she has been a resident of Indian Head Park for thirty (30) years. Mrs. Pettersen inquired if a plan is available showing the layout of the modified plan for a fence to be twenty-five feet (25') out from the back of the house and if the property line is also shown on the plan. Mayor Andrews stated that a site plan rendering of the modified plan is not available and the proposal was presented to Mr. & Mrs. Pall as an accommodation proposal at the Zoning meeting. He noted that the current plan would include fencing the entire patio and additional feet into the rear yard not to exceed twenty-five feet (25') from the back of the house. Steve Klaczynski, of 6498 Big Bear Drive, stated that he agrees this issue is very much about Emily's safety and asked why there would be an objection to the fence since foliation screening will be provided for the boundary around the fence that would not be visible. He stated that it would be a minor inconvenience for neighbors to see a line of trees compared to a fence that would provide safety for this little girl to play freely in her yard and to enhance her quality of life. Sandy Hayes, 6634 Cochise Drive, stated that she has been a resident of Indian Head Park for thirty-five (35) years. She noted that Indian Head Park is a Tree City U.S.A. Village not a fence community. Lori Davis, of Apache Drive, inquired if the Board will be changing the definition of a safety fence because a current definition of a safety fence provides for the protection of the community to keep children safe from walking into a yard with an in-ground pool and to keep people on the outside of the fenced area safe. Mayor Andrews stated the Village is not directly amending the zoning code or any part of it that deals with fences or safety fences. He added the issue before the Board is a request by the petitioners for this particular temporary safety fence. Mayor Andrews stated that a public hearing would need to be held to consider a text amendment to the zoning code before any changes take place and the Board at this time has no plans to change the definition section of the code.

Tim Kyzivat, stated that the petitioners made a statement that Emily is very, very active and he asked who will protect the child from the fence to prevent her from getting hurt. Mr. Kyzivat stated that there were many comments from the audience that supervision is needed to protect the child with or without a fence. Harry Abbott, 6490 Apache Drive, stated that he is a resident of Indian Head Park for thirty (30) years and everyone is concerned about disadvantaged children. Mr. Abbott stated that the parents say that the child must have a fence and it must be in Indian Head Park. He asked if there are any benefits for this child to live in Indian Head Park that she would not have in LaGrange, Western Springs or LaGrange Highlands that are in the same school district and those towns allow fences. Mr. Abbott stated that the parents knew Indian Head Park did not allow fences yet still they purchased a home without knowing if a fence would be approved.

Kenneth Kubiesa, Mr. & Mrs. Pall's attorney, stated that he does not have much to say because everything has been said at the public hearing process. Mr. Kubiesa stated that in response to Mr. Callahan's comments, Emily is a life long resident of Indian Head Park and she deserves the consideration of this Board. He added that the only issue before this Board is safety and a reasonable accommodation for a fence.

Mr. Kubiesa stated that a dog run is not a reasonable accommodation for Emily's situation and he as well as his clients are willing to sit down and compromise if there is some compromise to be made but not in a forum such as this evening. Mr. Kubiesa further stated that perhaps the discussion could continue in the form of a meeting with Mr. Alonzo or the Village attorney. Mr. Kubiesa stated that Emily's best interests are not being served by a cage or a dog run and there needs to be a balance of interests as well as Emily's safety. Mayor Andrews stated that he is troubled by the comments made by various individuals likening the fence to a cage or dog run as if we were discussing confining an animal when in fact we are dealing with a fine beautiful human being. The matter before the Board is a request for a temporary safety fence in a backyard and references to an animal really minimizes what the issues are before the Board. Mayor Andrews further stated that the Board is reviewing a request from a petitioner to allow for a fence in a portion of a rear yard, there are more issues involved than just the safety of Emily and what accommodations can be made, there is also a community that has a no fence ordinance and there are many issues to be considered. Trustee Bermier stated that when she heard someone reference the fence as a cage or dog run, she measured twenty-five feet (25') from her front door by eight-feet (8'). Trustee Bermier further stated 25' by 8' is a lot of room that would accommodate swings or other playground equipment for a child and she does not agree that the fenced area is a cage or run for a dog. Trustee Bermier noted that Mr. & Mrs. Pall lived on Blackhawk Trail and she asked if they had a fence on that property. Mrs. Pall stated that there was an existing fence around an in-ground pool and a wrought iron fence around a deck as well and the backyard area with a small patch of grass. Trustee Bermier asked why there was no need to fence the entire yard for the property on Blackhawk. Mrs. Pall stated that there was not much room in the backyard and the property was heavily wooded. Trustee Bermier stated that in all the suggestions from the Zoning Commission the property owners were concerned if alternative fencing was used Emily would be gone in an instant and it would be hard to keep up with the child. Mr. Pall stated that Emily was born in the  home on Blackhawk Trail, the lot is heavily wooded, the in-ground pool was not used for safety reasons since Emily was born and he asked if there was a reason the Village did not allow fences since 1952. Trustee Andrews stated that the Village's Zoning Code was established in 1964 and the reason we have such a wonderful community is because of our zoning code which works fine. He noted there are some parts of the code that may have archaic wording but the code works fine for this Village. Mayor Andrews pointed out that Indian Head Park is a unique community and does not want to be a Western Springs or LaGrange. Trustee Coleman inquired when Emily was born. Mrs. Pall stated that Emily was born in the year 2000. Trustee Walsh stated that if this matter came to the Village thirty years ago, this Board could make a decision to uphold the fence regulations and not grant a fence. He added that the Board must also consider changes in the law as it relates to ADA requirements and Fair Housing requirements, it is important for the Village's legal counsel to advise the Board what those rules are as it relates to this request, the impact of those rules and what the consequences would be for the Village in the event the Board decided not to allow any type of reasonable accommodation.

Mayor Andrews asked Richard Ramello, the Village's counsel, to advise the Board on the laws that pertain to the zoning request before the Board this evening.

Richard Ramello, Village counsel, stated that there are two Federal Statutes that Trustee Walsh is referring to concerning the zoning request before the Board. Specifically, the Americans with Disabilities Act (ADA) and the Fair Housing Amendment Act. Mr. Ramello further stated that both of those acts in this application are somewhat similar in that both acts require a Village to make a reasonable accommodation to a person who has disabilities whether it be by carrying an ordinance, amending an ordinance or whatever rules or regulations that a Village imposes. He further stated that reasonable accommodations would have to be made to accommodate the disability that is presented to the Village. Mr. Ramello stated that the laws do not necessarily say what that reasonable accommodation is and there is some case law as cases find their way through the court system that would provide direction to the Board on reasonable accommodations. He noted that the two statutes do not specify the course a Board can take to determine exactly a reasonable accommodation. Mr. Ramello stated that a method of getting to a point of a reasonable accommodation is balancing the interests of the community as well as the interest of the homeowner and the person with the disability. Mr. Ramello stated that Federal Statute trumps the local ordinance regulations as it relates to the fence regulations concerning this zoning matter and there is one case where a community did allow fences but not in a front yard and the courts upheld the Village Board's action in allowing a rear yard fence instead of a front yard fence to accommodate a person with disabilities.

Mr. Ramello stated that if a case were to reach the court system and go before a judge or beyond that to an Appellate Court, they would look at what would be reasonable to accommodate the needs of the disabled person. Trustee Schnaufer asked if the matter were to go before a judge and it was determined that the Board's decision was not reasonable would the court outline something that would be reasonable. Mr. Ramello stated that in most zoning matters that go before a judge the court system either accepts or rejects the plan presented and there is no specific case that would limit the court from crafting their own reasonable accommodation. However, there are cases where Village's have refused to provide a reasonable accommodation and the courts in those cases have struck down the ordinance and granted the petitioners request. Mr. Ramello advised the Board to make a reasonable accommodation for Emily under Federal law as well as balancing the interests of the community. Trustee Walsh stated if the petitioner decides to pursue litigation what would be the estimated financial cost to the Village and is there an attorney fee shifting provision in the statute. Mr. Ramello stated that the law defines that the prevailing party is entitled to attorney fees if they were to prevail and find that the disabled person was not provided a reasonable accommodation based on their disability.

Trustee Bailey stated that he heard Mr. Kubiesa, Mr. & Mrs. Pall's counsel, state this evening that he is willing to compromise and he also read the letters submitted to the Village. Trustee Bailey asked Mr. Kubiesa if it is his position that the only reasonable accommodation is to fence the entire yard as set forth in the original petition or is there a compromise that can be reached to meet halfway.

Mr. Kubiesa stated that there is something less than fencing the entire yard that could be reasonable but twenty-five feet (25') is not reasonable. Trustee Bermier stated that Mr. Kubiesa found the twenty-five feet (25') to be reasonable at the end of the zoning meeting and there was no objection voiced. Mr. Kubiesa stated that the twenty-five feet (25') was imposed upon the property owner and that he suggested thirty feet (30') or thirty-five feet (35') of the rear yard to be fenced as suggested to the Chairman at the zoning meeting. Trustee Bermier stated that she was present at the zoning meeting and recalled that Chairman Schermerhorn asked the petitioners if they agreed to twenty-five feet (25') and there was no objection. Mayor Andrews asked Mr. Kubiesa if his position is a fence that would be less than the entire backyard and less than the second proposal submitted to the Commission prior to the September 13th Board meeting. Mr. Kubiesa stated that he is not suggesting this is the only reasonable accommodation and there may be others that can be explored. Mayor Andrews stated that the Board should vote on the proposed plan for the fence that was presented to the Commission as a second plan. He noted this plan is the proposal for a fence that was presented to the Commission at the October 2, 2007 meeting as well as the report that was provided to the Board. Mayor Andrews entertained a motion to grant the petitioners request for a temporary safety fence as depicted in the modified plan (proposal #2). Trustee Walsh moved, seconded by Trustee Bailey, to grant the petitioners request for a temporary safety fence as depicted in the modified plan (proposal #2). The motion did not pass. (0/6/0).

*Aye:    None*
*Nay:    Anselmo, Bailey, Bermier, Coleman, Schnaufer, Walsh*
*Absent: None*

Mayor Andrews pointed out that the Board has attempted to be as diligent as possible as well as having Village counsel research laws as it relates to this zoning matter before the Board. He noted that when this matter first came before the Planning and Zoning Commission earlier this year, the Village's counsel at that time researched this matter as well as the current Village counsel. He added that both legal opinions had the same conclusion and the entire Board is fully aware that this issue not only involves the needs of a child but also the needs of the community. Mayor Andrews stated after being present at the last zoning meeting and hearing the suggestions made by Chairman Schermerhorn and the zoning members as well as visiting the property, the following recommendations are being suggested: (1) that the fence be no wider than the width of the rear foundation wall (south wall of the building) and extend no further than twenty-five feet (25') from the rear wall — this does not include any eaves or overhangs or the service doors on the east side of the building and the fence shall be no more than five-feet (5') in height; (2) that there be no spikes on the top of the fence; (3) that the fence be of wrought iron or similar maintenance free material and provide maximum openness; (4) that the fence be screened with some type of landscape screening such as evergreens that do not lose their leaves, that it would be installed by the owner and the landscaping would be at least five-feet (5') tall; (5) that the landscape screening would be installed immediately upon the installation of the fence and no later than (14) fourteen days after the installation of the fence;

(6) that the landscape screening be installed as close as possible to the fence and no further than five-feet from the fence consistent with landscaping techniques that could be provided by the Village's Arborist; (7) the existing Blue Spruce in the rear yard of the property may be incorporated into the landscape screening plan.

Mayor Andrews noted for the immediate neighbors that the twenty-five feet fenced area includes the patio area and would extend beyond the patio almost to the existing Blue Spruce. Mayor Andrews suggested the following conditions for the removal of the temporary safety fence under the following circumstances: if the special needs child no longer resides there as her principal residence, if the family no longer resides there as their principal residence; if the Pall's sell the house and prior to closing, removal of the fence when the medical need no longer exists with renewal every year regarding a certification of medical need for the fence and that the Village of Indian Head Park would have the right to request an independent medical review from time to time at its discretion. If the ordinance were to be approved granting a temporary safety fence, the ordinance should be recorded against the property to insure removal of the fence as per the conditions, with associated costs to be paid by the petitioners, a bond to be posted with the Village to insure removal of the fence  and if the petitioners enter into a contract to sell the property, the Village will be notified and if a gate is installed that it have a child-proof locking mechanism. Mayor Andrews stated that the above mentioned conditions are being suggested to provide a reasonable accommodation to grant a temporary safety fence for the property at 6472 Apache Drive. Trustee Coleman stated that she recalled that Commissioner Yelnick abstained from voting on the recommendation regarding a medical certification every year to prove the child still needed the fence. Trustee Coleman stated that every two or three years to review the medical need would be fine, after visiting the property twenty-five feet for a fenced area is a reasonable accommodation and compromise and the Board needs to balance the interests also of the entire community. Trustee Walsh stated that in essence the Village Board would be establishing a precedence for safety fences if there are others with disabilities that may wish to have a fence. Trustee Walsh stated that he supported the annual requirement for the medical need for the fence and a letter could simply be submitted by Emily's doctor on an annual basis and the requirement for an independent medical review to be conducted is merely in place to insure that if for some reason the information is not provided to the Village, a mechanism is in place to protect the interests of the Village to obtain the information. Trustee Walsh stated that he supported all of the recommendations made by Mayor Andrews. Trustee Anselmo suggested that a condition be added that if the petitioner enters into a contract to sell the property, that the Village would be notified.

Mr. Kubiesa stated that a reasonable accommodation under these circumstances would be one that the Village and his client could agree to and his client cannot agree to the conditions set forth due to reasons stated in his letter to the Village. Mr. Kubiesa stated that he would be willing to sit down with Village representatives to reach an agreement but what the Village considers reasonable may not be reasonable to his clients. Mayor Andrews asked Mr. Kubiesa if there is anything in particular he does not agree with or if he disagrees with all of the conditions set forth in general.

Mr. Kubiesa stated that he has not had an opportunity to confer with his client and he asked if the Board would consider a motion to continue this matter to continue the discussions. Trustee Bermier stated that the definition of compromise is when parties make mutual concessions and she asked what concessions are being made by the petitioners and their counsel.

Mr. Kubiesa stated that a modified plan was presented as a compromise but not to the extent that was suggested by the Mayor this evening. Trustee Anselmo stated that she grew up in the City of Chicago, 90%of the residential lots are 25' by 125', twenty-five feet extending into the rear yard for a fence is a big compromise and there are other people who also live in the community in the immediate area that need to live there too so the interests of others also need to be balanced. Mrs. Pall stated that she never asked for an accommodation for a fence in the front yard when she could have but chose to ask for a fence in the rear yard that would not be visible and she has been more than agreeable on this matter. Mayor Andrews stated that Mr. Kubiesa mentioned that he has not had an opportunity to discuss all of the conditions with his clients. Mayor Andrews asked the Board if they preferred to entertain a motion to continue the discussions with regard to a reasonable accommodation to the November meeting or if the Board prefers to vote on the proposal with conditions set forth this evening and to offer the petitioners an opportunity to respond. Trustee Walsh suggested the Board vote on the matter and stated this issue has been considered for a long period of time. Trustee Bailey stated that most the items recommended this evening were also discussed at the zoning meeting, Mr. Kubiesa had an opportunity to talk to his clients about the items discussed and a vote should take place to move forward on this issue.

Mayor Andrews entertained a motion to direct counsel to prepare an ordinance to grant a temporary safety fence for the property at 6472 Apache Drive consistent with the recommendations, terms and conditions as specified this evening and as read into the record of the meeting this evening. Trustee Walsh moved, seconded by Trustee Coleman, to direct counsel to prepare an ordinance for the Board's consideration at the November Board meeting. Carried by unanimous roll call vote (6/0/0).

*Aye: Anselmo, Bailey, Bermier, Coleman, Schnaufer, Walsh*
*Nay: None*
*Absent: None*

Trustee Schnaufer and Trustee Bermier stated that they reluctantly voted in favor of granting a temporary safety fence only because of the requirements set forth by the American with Disabilities Act and Federal requirements. Mayor Andrews noted that an ordinance will be presented on the Consent Agenda at the next meeting for the Board's consideration and approval relative to this zoning matter. Mayor Andrews also asked Counsel Kubiesa to direct any comments or input in writing to the Village relative to this zoning matter.

Mayor Andrews thanked everyone for conducting themselves in an orderly manner. He noted the zoning matter before the Board is an important issue, the petition before the Board was specific to that property, there is no plan to change the code with regard to fences and it would be counter productive for people to line up to suggest they now have a need for a fence.

Mayor Andrews stated that many residents moved to the Village due to the open atmosphere and the temporary safety fence for the property on Apache Drive is an accommodation for a special needs child.

## ADJOURNMENT

There being no further business to discuss, Trustee Schnaufer moved, seconded by Trustee Coleman, to adjourn the regular Board meeting at 9:00 p.m. Carried by unanimous voice vote (6/0/0).

Respectfully Submitted,
Joseph V. Consolo, Village Clerk        Kathy Leach,  Deputy Clerk/Recording Secretary

JOSEPH M. DE CRAENE
ILLINOIS LAND SURVEYOR
8710 SKYLINE DRIVE
HINSDALE, IL 60527
PHN 630-789-0898
FAX 630-789-0697

# Plat of Survey

LOT 57 IN HADON'S WOODLAND HILLS SUBDIVISION OF THE SOUTH 30 ACRES OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 19, TOWNSHIP 38 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 6, 1975 AS DOCUMENT 23106182 N COOK COUNTY, ILLINOIS.

1" = 20'

10979.7 SF



Key

Fenceline = — — — —

public utility easement line = — · — ·

existing shrubbery = * * * *

existing tree =

NOTES:
- CHECK FOR EASEMENTS, BUILDING LINES AND OTHER RESTRICTIONS, IF ANY, NOT SHOWN HEREON. SURVEYOR HAS MADE NO INVESTIGATION OR INDEPENDENT SEARCH FOR EASEMENTS, ENCUMBRANCES, RESTRICTIONS, OR ANY OTHER FACTS THAT A CURRENT TITLE SEARCH MAY DISCLOSE.
- CHECK PROPERTY DESCRIPTION HEREON AGAINST DEED.
- SCALE HEREON MAY BE APPROXIMATE IN CERTAIN AREAS FOR CLARITY OR FROM REPRODUCTION IRREGULARITIES. DO NOT SCALE FROM PLAT.
- CONSULT WITH SURVEYOR PRIOR TO USING THIS PLAT FOR ANY CONSTRUCTION PURPOSES. COMPARE ALL INFORMATION SHOWN BEFORE USE.
- DO NOT ASSUME THAT PROPERTY MONUMENTS ARE AT PROPERTY CORNERS.
- DO NOT ASSUME THAT PROPERTY CORNERS INDICATED REMAIN IN PLACE.
- SURVEY PLAT NOT VALID UNLESS EMBOSSED IMPRESSION OF SURVEYOR'S SEAL IS AFFIXED HEREON.



JOSEPH M. DE CRAENE
2476
PROFESSIONAL
LAND
SURVEYOR
STATE OF
ILLINOIS
HINSDALE, ILL

THIS PROFESSIONAL SERVICE CONFORMS TO THE CURRENT ILLINOIS MINIMUM STANDARDS FOR A BOUNDARY SURVEY.

DATE: JUNE 7                A.D. 2007

Joseph M De Craene

ILLINOIS LAND SURVEYOR NO. 2476

LIC. EXP. 11-30-2008

ORDERED BY: BRIAN T. MORROW

ORDER NO: 070422

© COPYRIGHT    2007    JOSEPH M. DE CRAENE



tabbies

EXHIBIT

E

October 2, 2007

Dear Zoning and Planning Commission,

The intent of my letter is to provide you with important and relevant information regarding Emily Pall's cognitive and adaptive skill functioning. Emily presents with a medical diagnosis of Down Syndrome. She is receiving special education services under the eligibility of the disability Cognitive Delay. Based on her recent psychological evaluation, Emily meets the DSM-IV criteria for mental retardation: significantly subaverage intellectual functioning; concurrent deficits in adaptive functioning. Her Individual Educational Plan provides her with the support of resource service, speech/language, occupational and physical therapies and a one to one paraeducator. Emily's daily living skills, communication, problem solving and socialization skills are estimated to be within the range of a 3.0 year old child. She does not understand rules or boundaries that are expected of a child her age. It has been documented that at school Emily has to be monitored carefully to insure her safety. It is evident that her disability is interfering with her ability to learn and function independently. Accommodations such as providing structure, limits and physical boundaries such as fences in outside yards are necessary to allow her to access major life activities such as age-appropriate outdoor play as well as to insure her safety, health and well being. It is my belief that to deny her a fenced yard home environment is discriminatory in nature.

Sincerely,

Jennifer Ames
LaGrange Highlands D106
Director of Special Education
708 485-3131
james@district106.net



ORDINANCE NO. 07 - _____

*This space reserved for Recorder's use only.*

## AN ORDINANCE TO APPROVE AND AUTHORIZE
## A FENCE VARIATION TO THE PROPERTY COMMONLY
## KNOWN AS 6472 APACHE DRIVE, INDIAN HEAD PARK, ILLINOIS

PASSED AND APPROVED BY
THE PRESIDENT AND BOARD OF TRUSTEES
THIS 8TH DAY OF NOVEMBER 2007.

Published in pamphlet form by authority of the
corporate authorities of the Village of Indian Head Park,
Illinois, the 8th day of November 2007.



ORDINANCE NO. 07 - _____

**AN ORDINANCE TO APPROVE AND AUTHORIZE
A FENCE VARIATION TO THE PROPERTY COMMONLY
KNOWN AS 6472 APACHE DRIVE, INDIAN HEAD PARK, ILLINOIS**

**WHEREAS,** pursuant to the provisions of the Indian Head Park Zoning Ordinance, the

Petitioners, Mr. and Mrs. Michael Pall, the owners of the real estate commonly known as 6472

Apache Drive, Indian Head Park, Illinois, and legally described in Exhibit A attached hereto and

made a part hereof (the "Subject Property"), have petitioned for a variation of the general prohibition

against fences of Section 17.12.120 of the Indian Head Park Zoning Ordinance to permit the

construction of a safety fence to an existing single-family residence proposed to be constructed in

an R-1 Single Family Residential District; and

**WHEREAS,** the variation request was duly filed with the Planning and Zoning Commission

which considered the matter pursuant to a duly noticed public hearing on Tuesday, June 5, 2007, and

thereafter, on a modified proposal on Tuesday, October 2, 2007; and

**WHEREAS,** the Planning and Zoning Commission has made the following findings of fact:

1.    A notice containing the particular location of the Subject Property as well as a brief

statement of the proposed variation and of the time and place of the public hearing was

published in the *Suburban Life Newspaper*, a newspaper with a general circulation within

the Village of Indian Head Park which is published in Cook County, Illinois, there being no

newspaper published in the Village of Indian Head Park, Illinois, on May 12, 2007, which

date is not more than thirty (30) nor less than fifteen (15) days before the initial public

hearing was held and republished on September 22, 2007;

1

2.    A notice in the form of a sign conforming to the requirements of Section 17.24.120 of the Indian Head Park Zoning Ordinance was posted on the Subject Property May 10, 2007, until October 15, 2007, not less than seven (7) days before the public hearing was held;

3.    Written notice of the time and place of the public hearing was sent by regular mail, postage prepaid, to the owners of all parcels of real estate located within two hundred fifty feet (250') of the Subject Property on May 11, 2007, not less than fifteen (15) days before the public hearing was held;

4.    The Subject Property is residential property and, therefore, the standard that the property in question cannot yield a reasonable return if permitted to be used only under the conditions allowed by the regulations governing the district in which it is located is not applicable to the Subject Property;

5.    The plight of the owner is due to unique circumstances in that the Petitioners' child, Emily, has Trisomy 21 (known as "Downs Syndrome") and, therefore, requires boundaries of her environment to be designated by a fence;

6.    The variation, if granted, will alter the essential character of the locality because no other yards have been enclosed with a fence in the locality of the Subject Property; and, therefore, the standard has not been met;

7.    The standard that the particular physical surroundings, shape or topographical conditions of the specific property involved would bring a particular hardship upon the owner as distinguished from a mere inconvenience if the strict letter of the regulation were to be carried out is not applicable to the Subject Property because the surroundings, shape or topographical conditions of the Subject Property are not relevant to the erection of a fence;

2

8.    The conditions upon which the petition for variation is based would be applicable generally to other property within the R-1 Single Family zoning classification; and, therefore, the standard has not been met;

9.    The purpose of the variation is not based exclusively upon a desire to make money out of the Subject Property;

10.    The alleged difficulty or hardship has been created by a person presently having an interest in the Subject Property; and, therefore, the standard has not been met;

11.    The granting of the variation will be detrimental to the public welfare or injurious to other property or improvements in the neighborhood in which the Subject Property is located; and, therefore, the standard has not been met; and

12.    The proposed variation will impair an adequate supply of light and air to adjacent property, or otherwise endanger the public safety, or substantially diminish or impair property values within the neighborhood; and, therefore, the standard has not been met.

**WHEREAS,** Planning and Zoning Commission determined that the standards set forth in Section 17.40.060 E of the Indian Head Park Zoning Ordinance have not been met and proved by the Petitioners; and

**WHEREAS,** the Planning and Zoning Commission based upon the findings of fact , issued a written recommendation that the Subject Property be denied a variation from the general prohibition against fences of Section 17.12.120 of the Indian Head Park Zoning Ordinance to permit the construction of a safety fence to an existing single-family residence proposed to be constructed by the Petitioners in an R-1 Single Family Residential District; and

**WHEREAS,** the Planning and Zoning Commission further found that:

3

1. Downs Syndrome is a mental impairment which substantially limits one or more of the major life activities of the Petitioners' child which, therefore, falls within the protections of the federal Fair Housing Amendments Act of 1988 and the federal Americans with Disabilities Act and which require the Village of Indian Head Park to reasonably accommodate a person with a disability. Therefore, there is a particular hardship in the way of carrying out the strict letter of the Indian Head Park Zoning Ordinance relating to the general prohibition against fences of Section 17.12.120.

**WHEREAS,** the Planning and Zoning Commission made issued a written recommendation that the Subject Property be granted a variation from the general prohibition against fences of Section 17.12.120 of the Indian Head Park Zoning Ordinance to reasonably accommodate the Petitioners' child to permit the construction of a safety fence to an existing single-family residence in an R-1 Single Family Residential District subject to the following conditions:

1. That the proposed fence shall not extend beyond the building to the east or west and may not extend out from the building to the south more than twenty-five feet (25'); and

2. That the medical necessity for the fence must be verified by a medical professional at least every two (2) years for the variation for the fence to continue; and

3. That once the medical reason for the fence no longer exists, or the Petitioners' child, Emily, no longer resides at the Subject Property, the fence must be removed; and

4. That the fence must be fully screened by evergreen shrubbery; and

4

5.    That a performance bond be posted with the Village of Indian Head Park to assure the costs of removal; and

6.    That the ordinance granting the fence variation be placed of record with the Cook County Recorders Office.

**WHEREAS,** the corporate authorities of the Village of Indian Head Park find:

1.    That the standards for the granting of the variations have been not been met and proved by the Petitioners; but

2.    That the Petitioners' child, Emily, has Downs Syndrome which is a mental impairment which substantially limits one or more of the major life activities of the Petitioners' child which, therefore, falls within protections of the federal Fair Housing Amendments Act of 1988 and the federal Americans with Disabilities Act and which require the Village of Indian Head Park to reasonably accommodate a person with a disability.  Therefore, there is a particular hardship in the way of carrying out the strict letter of the Indian Head Park Zoning Ordinance relating to the general prohibition against fences of Section 17.12.120.

**NOW, THEREFORE,** be it ordained by the Village President and the board of trustees of the Village of Indian Head Park, Cook County, Illinois, as follows:

**Section 1.    Recitals.**

The corporate authorities hereby incorporate the foregoing preamble clauses into this Ordinance and make the findings as hereinabove set forth.

5

**Section 2.    Property Subject to Zoning Variation.**

The Subject Property is commonly known as 6472 Apache Trail, Indian Head Park, Illinois, and is legally described in Exhibit A, which is attached hereto and made a part hereof.

**Section 3.    Safety Fence Variation.**

A variance from the general prohibition against fences of Section 17.12.120 of the Indian Head Park Zoning Ordinance to reasonably accommodate the Petitioners' child is hereby granted for the construction of a safety fence to an existing single-family residence in an R-1 Single Family Residential District subject to the satisfaction of the following conditions:

1.  The proposed fence shall not extend to the east or west any wider than the rear foundation wall (south foundation wall excluding eaves and overhangs and excluding the service doors on the east side of the residence located on the Subject Property) of the residence located on the Subject Property; and

2.  The proposed fence shall not extend out from the residence located on the Subject Property to the south more than twenty-five feet (25'); and

3.  The proposed fence shall not be greater that five feet (5') in height (measured from the current undisturbed ground level); and

4.  The proposed fence shall not have spikes or pointed ends on the top of the fence; and

5.  The proposed fence shall be constructed of wrought iron or anodized black aluminum (no wood, polyvinyl chloride or other plastic material permitted), and the design of the fence shall provide maximum openness to the transmission of air; and

6.  The gate of the proposed fence shall be equipped with a self-closing/child-proof closing mechanism; and

6

7.  The proposed fence shall be screened from view by landscaping consisting of evergreens at least five feet (5') in height. The landscape screening shall be installed within fourteen (14) days of installation of the fence as close as possible to the fence consistent with good landscaping techniques (no further than five feet (5') from the fence). The existing blue spruce in the rear yard of the Subject Property may, at the property owners' option, be incorporated into the landscape screening. The landscape screening shall be maintained at all times so as to screen the fence from view by persons located at ground level off of the Subject Property. The landscape plan shall be submitted to and approved by the Village of Indian Head Park prior to installation of the fence.

8.  The Petitioners shall annually submit to the Village of Indian Head Park a report from a licensed medical professional evidencing that special needs of the Petitioners' child, Emily, require the need for the boundaries of her environment to be designated by a fence. The Village of Indian Head Park shall have the right to request and obtain an independent medical review, at its expense, from a licensed medical professional to verify that special needs of the Petitioners' child, Emily, require the need for the boundaries of her environment to be designated by a fence.

9.  The Petitioners shall notify the Village of Indian Head Park, in writing, upon the execution of a contract to sell or otherwise transfer of title of the Subject Property by the Petitioners.

10. The Petitioners shall provide to the Village of Indian Head Park an estimate from a licensed fence contractor evidencing the cost of removal of the fence.

7

The Village of Indian Head Park shall have the right to verify and determine the cost of removal of the fence from the estimate submitted by the owners or by other means. Prior to installation of the fence, the Petitioners shall deliver to the Village of Indian Head Park a performance bond or letter of credit in the amount of the cost, determined by the Village of Indian Head Park, of the removal of the fence to assure that the fence is removed as required by this ordinance. In the event that the fence is not removed as required by this ordinance, the Petitioners hereby grant to the Village of Indian Head Park, upon five (5) days' written notice to Petitioners, the right to enter upon the Subject Property, by its own forces or by a contractor hired for such purpose by the Village of Indian Head Park or by the Petitioners' surety, to remove the fence. The cost of such removal shall be borne by the Petitioners; however, the Village of Indian Head Park may, but is not required to, use the proceeds of any performance bond or letter of credit posted to offset the costs of removal of the fence and to collect from the Petitioners any deficiency. Upon removal of the fence and the payment of the costs thereof by the Petitioners, any performance bond or letter of credit posted, or unused portion thereof, shall be returned to the Petitioners.

**Section 4.**     **Termination of Fence Variation.**

The fence variation herein granted shall immediately terminate and the fence shall immediately be removed, at the Petitioners' expense, on the occurrence of the earliest of any of the following:

    a.    if any of the conditions listed in Section 3 above are violated; or

    b.    the special needs of the Petitioners' child, Emily, no longer require the need for the boundaries of her environment to be designated by a fence; or

    c.    the Petitioners' child, Emily, no longer resides at the Subject Property; or

8

    d.      the family of the Petitioners, including their child, Emily, no longer resides at the Subject Property; or

    e.      the closing of the sale or other transfer of title of the Subject Property by the Petitioners.

In addition, the fence variation herein granted shall immediately terminate upon the permanent removal of the fence by the Petitioners for any reason.

### Section 5.     Recording of Ordinance.

This ordinance shall be placed of record with the Cook County Recorders Office, at the Petitioners' expense.

### Section 6.     Compliance with Code.

Except as modified by the relief granted, the fence shall be constructed in compliance with all other provisions of the Indian Head Park Zoning Ordinance and all other provisions of the Indian Head Park Municipal Code.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Section 7.    Effective Date.**

This Ordinance shall take effect upon its passage, approval and publication in pamphlet form.

ADOPTED this 8th day of November 2007, pursuant to a roll call vote as follows:

**AYES:** _____

**NAYS:** _____

**ABSENT:** _____

**ABSTENTION:** _____

APPROVED by me this 8th day of November 2007.

_____
Richard S. Andrews, President of the
Village of Indian Head Park, Cook County, Illinois

ATTESTED and filed in my office,
and published in pamphlet form
this 8th day of November 2007.

_____
Joseph V. Consolo, Clerk of the Village of
Indian Head Park, Cook County, Illinois

10

**EXHIBIT A**

**LEGAL DESCRIPTION OF 6472 APACHE DRIVE, INDIAN HEAD PARK, ILLINOIS**

LOT 57 IN HADON'S WOODLAND HILLS SUBDIVISION OF THE SOUTH 30 ACRES OF THE NORTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 19, TOWNSHIP 38 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 6, 1978 AS DOCUMENT 23106182 IN COOK COUNTY, ILLINOIS.

Common Address: 6472 Apache Drive, Indian Head Park, Illinois

P.I.N. 18-19-210-005-0000

THIS DOCUMENT WAS PREPARED BY:

Richard J. Ramello
Storino, Ramello & Durkin
9501 West Devon Avenue, Suite 800
Rosemont, Illinois 60018

AFTER RECORDING THIS DOCUMENT SHOULD BE MAILED TO:

Mr. Frank Alonzo, Village Administrator
Village of Indian Head Park
201 Acacia Drive
Indian Head Park, Illinois 60525

101904.1                                    11

**EXHIBIT A**

**LEGAL DESCRIPTION OF 6472 APACHE DRIVE, INDIAN HEAD PARK, ILLINOIS**

LOT 57 IN HADON'S WOODLAND HILLS SUBDIVISION OF THE SOUTH 30 ACRES OF THE NORTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 19, TOWNSHIP 38 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JUNE 6, 1978 AS DOCUMENT 23106182 IN COOK COUNTY, ILLINOIS.

Common Address: 6472 Apache Drive, Indian Head Park, Illinois

P.I.N. 18-19-210-005-0000

THIS DOCUMENT WAS PREPARED BY:

Richard J. Ramello
Storino, Ramello & Durkin
9501 West Devon Avenue, Suite 800
Rosemont, Illinois 60018

AFTER RECORDING THIS DOCUMENT SHOULD BE MAILED TO:

Mr. Frank Alonzo, Village Administrator
Village of Indian Head Park
201 Acacia Drive
Indian Head Park, Illinois 60525

*Village of Indian*
*Park Fencing Law 1964*

17.12.010

## Chapter 17.12

### GENERAL PROVISIONS

*Don't know
why (their mayor
and board)
it was drafted
or changed.*

Sections:

17.12.010    Interpretation.
17.12.020    Separability.
17.12.030    Scope of regulations.
17.12.040    Allowable use of land or buildings.
17.12.050    Prohibited use of land or buildings.
17.12.060    Control over bulk.
17.12.070    Accessory buildings and uses.
17.12.080    Special uses.
17.12.090    Yards in general.
17.12.100    Permitted obstructions in required yards.
17.12.110    Floodplain area.
17.12.120    Fences.
17.12.130    Enclosures for housing domestic animals.

**17.12.010    Interpretation.**

A. In their interpretation and application, the provisions of this title shall be held to be the minimum requirements for the promotion of the public health, safety, morals and welfare.

B. Where the conditions imposed by any provision of this title upon the:

1. Use of land or buildings;
2. The bulk of buildings;
3. Floor area requirements;
4. Lot area requirements; and
5. Yard requirements

are either more restrictive than comparable conditions imposed by any other provision of this title or of any other law, ordinance, resolution, rule or regulation of any kind, the regulations which are more restrictive, or which impose higher standards or requirements shall govern.

C. This title is not intended to abrogate any easement, covenant or other private agreement, provided that where the regulations of this title are more restrictive, or impose higher standards or requirements than such easements, covenants or other private agreements, the requirements of this title shall govern.

D. No building, structure or use not lawfully existing at the time of the adoption of the ordinance codified in this title shall become, or be made lawful solely by reason of the adoption of said ordinance, and to the extent that, and in any manner that said unlawful building, structure or use is in conflict with the requirements of this title, said buildings, structure or use remains unlawful hereunder.

E. Nothing contained in this title shall be deemed to be a consent, license or permit to use any property, or to locate, construct or maintain any building, structure or facility, or to carry on any trade, industry, occupation or activity.



17.12.010

F.  The provisions in this title are cumulative and additional limitations upon all other laws and ordinances, heretofore passed or which may be passed hereafter governing any subject matter in this title. (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(A))

## 17.12.020    Separability.

It is declared to be the intention of the president and board of trustees of the village that the several provisions of this title are separable, in accordance with the following:

A.  If any court of competent jurisdiction shall adjudge any provision of this title to be invalid, such judgment shall not affect any other provisions of this title not specifically included in said judgment.

B.  If any court of competent jurisdiction shall adjudge invalid the application of any provision of this title to a particular property, building or other structure, such judgment shall not affect the application of said provision to any other property, building or structure not specifically included in said judgment. (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(B))

## 17.12.030    Scope of regulations.

It is declared that the provisions of this title shall apply to all properties as hereinafter specifically provided:

A.  No building or structure or part thereof shall hereafter be erected, constructed, reconstructed, enlarged, moved or structurally altered, and no building, structure or land shall hereafter be used, occupied or arranged or designed for use or occupancy, nor shall any excavating or grading be commenced in connection with any of the above matters, except as permitted by the regulations of this title for the zoning district in which such building, structure or land is located.

B.  Except as may otherwise be provided, all structural alterations or relocation of existing buildings occurring hereafter and all enlargements of or additions to existing uses occurring hereafter shall be subject to all regulations herein which are applicable to the zoning districts in which such buildings, uses or land shall be located.

C.  Not more than one principal detached residential building shall be located on a zoning lot, nor shall a principal attached single-family residential building be located on the same zoning lot with any other principal building, except in the case of planned unit developments and other special uses.

D.  More than one principal detached building, other than residential buildings, may be located on a zoning lot, provided the requirements of this title are met separately for each individual use. Lot area, or other criteria, used to satisfy one use cannot be counted again and used to satisfy a separate use, except in the case of planned unit development.

E.  No land which is located in a residential district shall be used for driveway, walkway or access purposes to any land which is located in a commercial or industrial district, or used for any purpose not permitted in a residential district, except in the case of planned unit developments. (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(C))

**17.12.040    Allowable use of land or buildings.**

The following uses of land or buildings are allowed in the districts indicated in Chapters 17.32 through 17.108 under the conditions specified in this title:

    A.  Uses lawfully established on the effective date of the ordinance codified in this title;

    B.  Permitted uses as designated in Chapters 17.32 through 17.108.

    C.  Special uses. (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(D))

**17.12.050    Prohibited use of land or buildings.**

No building or tract of land shall be devoted to any use other than one which is specified as a permitted or special use in the zoning district as specified in Chapters 17.32 through 17.108 in which such building or land is located. (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(E))

**17.12.060    Control over bulk.**

    A.  All new buildings shall conform to the bulk regulations established in this section for the district in which each building is located. Further, no existing building shall be enlarged, reconstructed, structurally altered, converted or relocated in such a manner as to conflict, or to further conflict with the bulk regulations of this section for the district in which such building shall be located.

    B.  Where two or more permitted or special uses, each requiring a minimum lot area, are provided in the same building or on the same lot, the required lot area shall be the sum of the areas required for each use individually.

    C.  No improved zoning lot shall hereafter be divided into two or more zoning lots unless all improved zoning lots resulting from each such division shall conform with all the applicable bulk regulations of the zoning district in which the property is located. If a lot is built upon under one building permit, then divided for selling purposes, it can only be so divided if each saleable lot, or portion of the original lot, is platted as a lot of record and conforms to Indian Head Park subdivision regulations.

    D.  All yards and other open spaces allocated to a building or buildings shall be located on the same zoning lot as such building or buildings. (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(F))

**17.12.070    Accessory buildings and uses.**

    A.  Accessory uses shall be compatible with the principal use and shall not be established prior to the establishment of the principal use and shall not include the keeping, propagation or culture of pigeons, poultry or livestock whether or not for profit. Private in-ground swimming pools shall be permitted accessory uses in any residence district, provided they conform with the regulations of this title and other applicable ordinances of the village.

    B.  No accessory building, unless it is structurally a part of the principal building, and, unless it conforms with requirements of accessory buildings for special uses, shall be erected or altered at or within the required area for front, side or rear yard of the lot as set forth in the district.

    C.  No accessory building shall have more than one story, nor exceed seventeen feet in height, unless otherwise permitted as accessory to authorized special uses. (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(G))

17.12.080

**17.12.080     Special uses.**

A.  To provide for the location of certain uses hereinafter specified, which are deemed desirable for the public welfare within a given district or districts, but which might have an adverse effect upon nearby properties or upon the character and future development of the district in which they are located, a classification of special use is established. Procedures for special uses are set forth in Chapter 17.32.

B.  Where a use exists on the effective date of the ordinance codified in this title and it is classified as a special use by said ordinance, it shall be considered to be a lawful special use. Additions or alterations to existing buildings or land improvements for expansion of lawful special uses may be made within the area of the lot included in the ownership existing at the time of adoption of said ordinance, and they shall be subject to yard, floor area ratio and building height requirements set forth in this title for permitted uses in the districts in which they are located.

C.  If the special use ceases for a period of more than one year, the special use permit shall be void and the special use cannot again be started. A special use permit may authorize one or more special uses, in accordance with the terms of the special permit.

D.  On each lot in R-1 residential zoning districts, at most only one unattached structure can be erected in addition to the principal building; such unattached structure shall be regarded as an accessory use and will be permitted under provisions of "special uses" as regulated by this title, as amended, and by additional requirements specified in the building code, as amended, and the property maintenance code, as amended. (Ord. 84-7 § 3 (part); Ord. 78-13 § 2 (part): Ord. 64-1 § IV(H))

**17.12.090     Yards in general.**

A.  The minimum yard space required for one structure shall not again be considered as yard space for another adjoining structure.

B.  No lot shall be reduced in area so that the yards or other open spaces become less than required by this title.

C.  On a vacant through or corner lot, either of the lot lines abutting a street right-of-way line may be established as its front lot line, except that where two or more through lots are contiguous and a front line has been duly established, the same street lot line shall thereafter be deemed to be the front lot line of all contiguous lots. On a through lot, a front yard shall be provided along any lot abutting a street.

D.  Unattached structures such as private garages, playhouses and sheds designated as an accessory use may be permitted in R-1 residential zoning districts only as a "special use" and shall be regulated by provisions in this title, as amended, the building code, as amended, and the property maintenance code, as amended.

E.  For the purpose of establishing permitted obstructions, any yard which adjoins a street shall be considered a front yard, except where otherwise provided.

F.  Unattached structures as permitted within the provisions for special use in this title shall be considered nonconforming upon failure to comply with all criteria specified for garages, playhouses

and sheds in the building code, as amended, and the property maintenance code, as amended, and shall be subject to the nonconforming provisions of Section 17.16.040(H).

G. On corner lots, no structures or plant materials shall obstruct a clear path of motor vehicle driver's vision of approaching vehicles within a triangular area determined by a diagonal line connecting two points measured thirty-five feet equidistant from the street corner of the two intersecting street lines.

H. All required front, interior side, corner side and rear yards shall be unobstructed from ground level to the sky, except as allowed in Sections 17.12.100, 17.36.130 and 17.40.130. All structures which are attached to principal buildings (as attached garages) shall comply with the yard requirements of the principal building. (Ord. 84-7 § 3 (part); Ord. 64-1 § IV (I))

**17.12.100     Permitted obstructions in required yards.**

A. In Any Yards. Ornamental light standards and flagpoles.

B. Rear Yards. Private in-ground swimming pools, recreational equipment and laundry drying equipment.

C. Any obstructions not specifically stated in this section, or as applicable in Sections 17.36.130 or 17.40.130 as permitted obstructions in required yards will not be permitted except by variation. (Ord. 78-13 § 2 (part): Ord. 77-10 § 1: Ord. 64-1 § IV(J))

**17.12.110     Floodplain area.**

In the continuous area and three feet beyond such area adjacent to a stream, stream bed or other natural drainage basin or channel whose elevation, including also any land of higher elevation having an area of less than ten acres which is completely surrounded by land having an elevation equal to or lower than the flood crest elevation or land which is wholly or partially in flood plain as defined by ordinance, no building or structure shall be erected unless a building site not lower than the applicable high water elevation plus 2.0 feet (1) exists on the front part of the lot or parcel or (2) will be built up during excavation of the subdivision improvement plan through general excavation and filling, or (3) can be provided with excavation taken from within the area or lot or parcel when it is built upon. The high water elevation shall be the flood levels as established by village ordinance by the most recent and best available data and information listed in the MSD manual of Procedures, Article 5, "Construction within the Floodplain" (LSS-78-01). (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(K))

**17.12.120     Fences.**

Fences are prohibited except as follows:

A. Those required for safety as determined and upon such terms and conditions as may be imposed following the procedures for variations in this title; or

B. On residential lots located immediately adjacent to (or separated only by a street or public highway right-of-way from) a lot or parcel designated and zoned under a business district designation under Section 17.28.110 (B) of this code, but only upon the following conditions:

287

17.12.120

   1. That the fence shall be constructed only along and within five feet of the boundary of said lot which is adjacent to (or separated only by a street or public right-of-way from) the lot or parcel designated and zoned under a business district designation,

   2. That the fence shall be no more than eight feet in height,

   3. That the fence shall be constructed only of weather-resistant wood, including cedar, redwood or treated lumber, and

   4. That the materials and design of any repairs to or replacement of a fence shall be identical to those of the fence so repaired or replaced, but the height may be altered. (Ord. 96-13 § 1: Ord. 78-13 § 2 (part): Ord. 64-1 § IV(L))

**17.12.130    Enclosures for housing domestic animals.**

   Such enclosures are to have a maximum enclosed area of seventy-five square feet. The enclosed are shall be entirely floored by a poured concrete slab. Such enclosure slab must be surrounded by a suitable fence, and shall be no further than two feet from the principal building. No portion of the enclosure shall be located in, or shall encroach upon the side-yard setback, rear-yard setback or front-yard setback. The enclosure must be provided with running water permanently available within five feet of the enclosure, and drainage connected to the building sanitary sewer or other sanitary disposal system as approved by the building department. All enclosures shall provide shelter for the enclosed animal. Construction of all such enclosures will require a building permit and approval of the village building department. (Ord. 78-13 § 2 (part): Ord. 64-1 § IV(M))

May 24, 2007

Dennis Schermerhorn, Chairman
Planning and Zoning Commission
Village of Indian Head Park
201 Acacia Drive
Indian Head Park, IL 60525

Dear Mr. Schermerhorn,

As residents of Apache Drive, Mohawk Ct., and Big Bear Drive, we vehemently oppose
the variance for a "safety fence" as applied for by the prospective new owners at 6472
Apache Drive.

Most of us moved to Indian Head Park many years ago, with valid consideration of the
fact that no fences, above ground pools, or detached structures would encroach on our
surroundings.   Many villages DO allow these detriments and we chose NOT to live
there because of this.

In addition, the property at 6472 Apache is an "interior" lot of the "Forty Acres" and
therefore it is one of the smaller ones in the Village.   The property at 6472 Apache
Drive backs up to cul de sac lots, which are considerably smaller in the rear already.

We trust that our zoning committee will continue to protect our investment and beautiful
park-like atmosphere that we in the Village hold so dearly.

Sincerely,



**EXHIBIT 3**

Frances Peterson 6428 Mohawk Court
Elizabeth Worker 6423 Big Bear Dr.
Josephine Ardizzone 6429 Mohawk Ct.
Charles Judith Potts 6421 Mohawk Ct.
Tom & Mary Prendergast 6450 Apache Dr.

Judy & Lee Bowles 6455 Big Bear Drive
Phyllis & Bernie Barrett 6453 Apache Ci, 6453 Apache Dr
IHP

Pall Fence Conditions!

## Conditions:  Can they live with:

Removal of the fence if the special needs child no longer resides there as her principal residence;

Removal of the fence if the family no longer resides there as their principal residence;

Removal of the fences if the Pall's sell the house and prior to closing;

Recording of the ordinance against the property to insure removal of fence as per conditions, associated costs to be paid by Petitioners;

Posting of a performance bond so that IHP can insure the fence is removed as per the conditions;

Landscape screening around the fenced-in area to be installed by the owners.  5 feet tall evergreens installed immediately following and no later than 14 days of the installation of the fence;  Screening will be installed as close as possible to the fence consistent with good landscaping techniques and no further than 5 feet from the fence.  The existing blue spruce in the rear yard of the property may be incorporated into such landscape screening.

Fence to be no wider than the width of the rear foundation wall (i.e. South Wall) of the building and extend no further than 25' from the rear wall; does not include any eaves or overhangs or the service doors on the east side of the building; shall be no greater than 5 feet high

No spikes on the top of the fence;

The fence to be of wrought iron or similar maintenance free material and provide maximum openness;

Require renewal every year regarding medical need;

Removal of fence when medical need no longer exists.  IHP shall have the right to request independent medical review from time to time at its discretion.

Gate to be self closing and have a child-proof locking mechanism.

K to sell ~~that~~ the property by Petitioner & notify the Village.

EXHIBIT
K

**Village of Indian Head Park
201 Acacia Drive
Indian Head Park, IL 60525**

MINUTES
VILLAGE OF INDIAN HEAD PARK
PLANNING AND ZONING COMMISSION
PUBLIC HEARINGS

*"Pursuant to 5 ILCS 120/2.06 (3) minutes of public meetings shall include, but need not be limited to: a general description of all matters proposed, discussed, or decided, and a record of votes taken."*

**Tuesday, June 5, 2007**

**7:30 P.M.**

## I.    CALL TO ORDER -DENNIS SCHERMERHORN, CHAIRMAN

A continuation of a public hearing was hosted by the Village of Indian Head Park Planning and Zoning Commission on Tuesday, June 5, 2007, at the Municipal Facility, 201 Acacia Drive. Chairman Schermerhorn noted that Zoning Petition #159, a petition for a rear yard variation for an addition residence for the property located at 6532 Blackhawk Trail, will be discussed this evening. Also, Petition #162 for a terms and conditions hearing to allow for a safety fence at 6472 Apache Drive, will also be discussed by the Commission. The meeting was convened at 7:30 p.m. by Chairman Dennis Schermerhorn and Kathy Leach, Zoning Commission Secretary, called the meeting to order.

## II.    ROLL CALL:  PRESENT (AND CONSTITUTING A QUORUM):

Chairman Dennis Schermerhorn
Commissioner Diane Andrews
Commissioner Noreen Costelloe
Commissioner Denise Ingram

**NOT PRESENT:**
Commissioner Earl O'Malley
Commissioner Jack Yelnick

**ALSO PRESENT:**
Debbie Anselmo, Zoning Trustee
Carol Coleman, Zoning Trustee

## III.    PLEDGE OF ALLEGIANCE TO THE FLAG

Chairman Dennis Schermerhorn and the Planning and Zoning Commission members led the audience in reciting the Pledge of Allegiance to the Flag as follows: *"I Pledge Allegiance to the Flag of the United States of America and to the republic for which it stands, one nation under God indivisible with liberty and justice for all".*



*PZC Minutes*
*June 5, 2007*

## QUESTIONS AND/OR COMMENTS FROM INDIAN HEAD PARK RESIDENTS/PROPERTY OWNERS IN ATTENDANCE REGARDING ZONING AGENDA ITEMS

None

**IV.    PUBLIC HEARING HELD BEFORE THE VILLAGE OF INDIAN HEAD PARK PLANNING AND ZONING COMMISSION (PUBLIC COMMENTS RECEIVED AFTER DISCUSSIONS BY THE PLANNING AND ZONING COMMISSION MEMBERS AND PRIOR TO VOTES)**

## ZONING AGENDA ITEMS:

1.    **Continuation of Petition #159 – A Request for a Rear Yard Variation Regarding an Addition to the Residence Located at 6532 Blackhawk Trail, Indian Head Park.**

Chairman Schermerhorn noted that an application for a zoning variation was filed with the Village regarding a petition for a variation from *Title 17, Zoning,* of the Municipal Code. A public hearing notice was published  to consider a request for a rear yard variation to allow for the construction of an addition to the residence for the property located at 6532 Blackhawk Trail, Indian Head Park. At the last meeting, the Commission discussed the proposed plans in the form of a workshop meeting and the public hearing process was continued to the meeting this evening to review revised plans for the rear yard addition. Chairman Schermerhorn noted: (1) revised site plans were submitted reflecting a reduction in the rear yard variance for a proposed addition to the residence. The new plan reflects a rear yard setback of 69.42 feet, a proposed rear setback of 59.74 feet a rear yard encroachment of 9.68 (reduced from 16.42 feet) and a 13.94% variance (reduced from 23.65%); (2) a plan review report dated May 15, 2007 and; (3) a letter sent to adjacent property owners regarding notification of a continuation of the public hearing. Mr. & Mrs. Nick Guardino stated that their architect revised the plan to reflect prior discussions with the Zoning Commission members and they are requesting a favorable recommendation to approve the variation as presented this evening. Chairman Schermerhorn summarized that Mr. & Mrs. Guardino met with the Commission in the form of a workshop meeting to review their proposed plans for an addition to the rear of the residence, the original plan reflected an encroachment into the rear yard setback of 16.42 feet resulting in a request for a rear yard variance of 23.65%. The Commission members suggested at that time the plan could possibly be revised to minimize the encroachment into the rear yard setback.

Chairman Schermerhorn noted that there were adjacent property owners in attendance at the first meeting; one neighbor did not support the variance due to the percent of the variance requested and one neighbor had concerns about drainage. As a result, the revised plan is being provided for the Commission's consideration. He further noted that the existing residential structure is fifty-feet (50') back from the road instead of forty-feet (40'), which creates a hardship for any type of addition to the residence. Commissioner Andrews inquired about the concerns of the neighbor that did not support the request for a variance. Chairman Schermerhorn stated that the neighbor to the south of property that owns a vacant lot had concerns with the initial variance request for an encroachment of about fourteen feet for a variance into the rear yard due to possible future plans he has to build a new home on his lot. Mr. Guardino stated that his home was built prior to the Village's zoning ordinances being established. Commissioner Andrews asked that the drainage and run-off from the property with the new addition be designed to prevent drainage onto other properties. Mr. & Mrs. Guardino's builder stated that draintile is part of the proposed plan for the new addition and drainage will be tied into that system. Commissioner Ingram stated that the property owner has designed a new plan that is consistent with the previous recommendations from the Planning/Zoning Commission. Chairman Schermerhorn stated that there are no adjacent property owners in the audience this evening either in support of or opposed to the variance.

Chairman Dennis Schermerhorn and the Commission members reviewed the following Findings of Fact with regard to the residential property at 6532 Blackhawk Trail to evaluate evidence presented in response to the following criteria before recommending a variation, as required by the Village's Zoning Ordinance, ***Title 17 Zoning, Section 17.23.060E***: (1) that the property in question cannot yield a reasonable return if permitted to be used only under the conditions allowed by the regulations governing the district in which it is located (not applicable -- this reference pertains only to commercial properties); (2) the plight of the owner is due to unusual circumstances (all commissioners agree); (3) the variation, if granted, will not alter the essential character of the locality (all commissioners agree); (4) the particular physical surroundings, shape or topographical conditions of the specific property involved would bring a particular hardship upon the owner as distinguished from a mere inconvenience if the strict letter of the regulation were to be carried out (all commissioners agree); (5) the conditions upon which the petition for variation is based would not be applicable generally to other property within the same zoning classification (all commissioners agree); (6) the purpose of the variation is not based upon a desire to make money out of the property (all commissioners agree); (7) the alleged difficulty or hardship has not been created by any person presently having an interest in the property (all commissioners agree); (8) the granting of the variation will not be detrimental to the public welfare or injurious to other property or improvements in the neighborhood in which the property is located (all commissioners agree);

*PZC Minutes*
*June 5, 2007*

(9) the proposed variation will not impair an adequate supply of light and air to adjacent property, or substantially increase the danger of fire, or otherwise endanger the public safety, or substantially diminish or impair property values within the neighborhood (all commissioners agree).

Commissioner Costelloe moved, seconded by Commissioner Ingram, to accept the findings of fact with regard to the zoning matter before the Planning and Zoning Commission this evening. Motion carried by unanimous roll call vote (4/0/2).

*Aye:    Chairman Schermerhorn and Commissioners: Andrews, Costelloe, Ingram,*
*Nay:    None*
*Absent: O'Malley, Yelnick*

Commissioner Costelloe asked if there are any trees that are planned to be removed as part of the addition to the residence. Mrs. Guardino stated that some trees on the property were moved to another area on the property.

Chairman Schermerhorn entertained a motion to submit a recommendation to the Village Board to accept the petition as presented for approval. Commissioner Costelloe moved, seconded by Commissioner Ingram, to submit a recommendation to the Village Board for approval of a rear yard variance of 9.68 feet to allow for an addition to the residence located at 6532 Blackhawk Trail with the following condition: (1) that the draintile system for drainage be tied into the addition to the residence. Carried by unanimous roll call vote (4/0/2).

*Aye:    Chairman Schermerhorn and Commissioners: Andrews, Costelloe, Ingram,*
*Nay:    None*
*Absent: O'Malley, Yelnick*

Chairman Schermerhorn stated that a report will be presented to the Village Board at the next meeting and a recommendation will be provided to approve granting the rear yard variation for an addition to the residence.

2.    *Petition #162 – A Petition for a Terms and Conditions Hearing in Connection with a Safety Fence for the Property Located at 6472 Apache Drive, Indian Head Park*

Chairman Schermerhorn stated that a petition is being presented by Mr. & Mrs. Michael Pall, the contract purchaser of the property located at 6472 Apache Drive, to allow for a safety fence.

*PZC Minutes*
*June 5, 2007*

The following exhibits were presented and reviewed by the Commission members concerning Petition #162: (1) the Commission was presented with a petition by Mr. & Mrs. Michael Pall, the contractor purchaser of the property located at 6472 Apache Drive. The zoning petition form dated May 7, 2007, was signed by Mr. & Mrs. Michael Pall; (2) a letter of approval from the current property owner to place the zoning sign on the subject property; (3) photographs of the type and style of proposed fence; (4) a list of adjacent property owners within 200' of the subject property; (5) a copy of the real estate contract for 6472 Apache Drive; (6) a copy of the Plat of Survey of the subject property; (7) a certificate of publication of the legal notice that appeared in the Suburban Life Newspaper on Saturday, May 12, 2007; (8) a copy of the letter sent to adjacent property owners within two-hundred feet (200') of the subject property dated May 11, 2007; (9) a memo to the Public Works Department dated May 10, 2007 regarding posting of the zoning sign; (10) a letter dated May 30, 2007 from Lori Davis of 6482 Apache Drive, opposing the proposed safety fence for the property at 6472 Apache Drive; (11) a letter dated May 24, 2007 signed by 17 residents of Apache Drive, Mohawk Court and Big Bear Drive, opposing the proposed safety fence at 6472 Apache Drive.

Mr. & Mrs. Michael Pall, stated that they lived on Blackhawk Trail for 10 years and recently sold their home, they are presently renting a home in Westmont and they recently entered into a contract to purchase the home at 6472 Apache Drive. Mr. Pall stated that he and his wife have been married for ten years and have two children, a son in 2nd grade who attends Highlands School and also a special needs daughter that is very high functioning and attends kindergarten. Mr. Pall stated that his daughter understands how locks and doors work and she even left the house on a few occasions, their previous home on Blackhawk Trail was very wooded. The home on Blackhawk Trail had an in-ground pool that was not used because it was not safe for their daughter. Mr. & Mrs. Pall stated that they love the Highlands School District, they have looked at other areas outside of Indian Head Park and they love the area as well as the home on Apache Drive. Mr. Pall stated that a safety fence with a locking mechanism is being requested so that his daughter can play safely in the backyard of the property without wandering off into the wooded areas or throughout the community. He further stated that the fence being requested is not a privacy fence but a five-foot fence around the rear property boundary for safety purposes with a gate in the side yard of the property. Mrs. Pall stated that the fence will be tan or grey with a weathered look and would fit in aesthetically with the home and wooded property around the area, the fence is for safety issues and she looked at other properties in the surrounding areas before deciding on the Apache Drive home. Mr. Pall stated that the fence would be placed in the rear yard of the property and a portion on the east side of the property where there is a side entrance door to the home.

Chairman Schermerhorn read the following letter dated May 30, 2007 into the record addressed to Dennis Schermerhorn, Chairman of the Planning and Zoning Commission from Lori Davis of 6482 Apache Drive:

*PZC Minutes*
*June 5, 2007*

*"Dear Mr. Schmerhorn, My husband and I drafted and signed the attached letter in protest of the proposed variance for a "security fence" at 6472 Apache Drive. We did not canvass the entire neighborhood, just some of the immediate neighbors. In conversation, many others in the neighborhood offered to support us, as they do not want a precedent set. If needed, we will get that written input from them. As an adjacent neighbor to the east we are very much affected by this proposed fence. We added to the beauty of our home with a 18 x 32 foot family room with 6 Paladian windows, with the certainty that our Village would never allow a fence in our view. We are appalled that the prospective owner is being inconsiderate of us, our beautiful home and long term investment. This past winter the prospective homeowner of 6472 Apache, put an offer on the house across the street (6477) contingent on approval of a fence. While this is a ½ acre lot, the fence would be extremely unfair to those immediate neighbors. But the offer was withdrawn before the Village hearing. Now they turn to a much small interior lot and bought a house without the contingent of fence approval. The assumption is this fence either isn't extremely important to the new owner, or that his arrogance leads him to believe that he can easily sway the Board. Thank you for your consideration and respect for the surrounding neighbors of 6472 Apache. Sincerely, Lori Davis, 6482 Apache Drive."*

Chairman Schmerhorn also read the following letter into the record dated May 24, 2007: *"Dear Mr. Schermerhorn, As residents of Apache Drive, Mohawk Court and Big Bear Drive, we vehemently oppose the variance for a "safety fence" as applied for by the prospective new owners of 6472 Apache Drive. Most of us moved to Indian Head Park many years ago, with valid consideration of the fact that no fences, above ground pools, or detached structures would encroach on our surroundings. Many Villages do allow these detriments and we chose not to live there because of this. In addition, the property at 6472 is an "interior" lot of the "Forty Acres" and therefore it is one of the smaller ones in the Village. The property at 6472 Apache Drive backs up to cul-de-sac lots, which are considerably smaller in the rear already. We trust that our zoning committee will continue to protect our investment and beautiful park-like atmosphere that we in the Village hold so dearly. Sincerely, (signed by 17 residents representing 12 properties)."*

Chairman Schermerhorn presented for reference purposes an aerial photograph of the Apache Drive area reflecting the property on 6472 Apache Drive as well as the surrounding lot areas. Commissioner Costelloe asked Mr. & Mrs. Pall why they are interested in purchasing a property in Indian Head Park when fences are not permitted. She noted that LaGrange Highlands and Western Springs allow fences and those areas are in the same school district. Mrs. Pall stated she liked the home at 6472 Apache and added that with regard to the previous offer on another home on Apache, that home did not pass inspection and the offer to purchase that property was withdrawn. Commissioner Costelloe asked Mrs. Pall why there was no contingency for a fence in the contract to purchase the property at 6472 Apache Drive.

Mr & Mrs. Pall stated that they were confident that a safety fence would be granted and that the police department informed them that variances have been granted for fences for special needs. Commissioner Andrews asked Mr. & Mrs. Pall if they have a medical need recommendation for a fence from their physician for their daughter who is 6 years old with Downs Syndrome or if it is their opinion a fence is needed. Mrs. Pall stated the police department has visited her home on occasion because her daughter has wandered off and that added protection is needed to keep her safe. Commissioner Andrews inquired if there was a fence at the former home on Blackhawk Trail. Mr. & Mrs. Pall stated that there was no backyard on the Blackhawk property for their children to play and the property was mostly wooded with only a small fenced area around the in-ground pool that was not used. Commissioner Andrews inquired if the entire perimeter of the property is planned to be fenced. Mrs. Pall stated that the east side of the side yard would be fenced all the way to the rear lot line and around the property boundary. Commissioner Andrews asked Mr. & Mrs. Pall if they are willing to fence a smaller area of the property for a play area for their children. Mrs. Pall stated that it would be more unattractive to the neighbors to fence only a small section of the property and a perimeter fence around the boundary would be preferred. Commissioner Andrews asked Mr. & Mrs. Pall if they are willing to install shrubbery on the lot line around the entire fence area to provide screening to the neighbors with the fence in the inside of the shrubbery. Mr. Pall stated that there is a lot of existing shrubbery on the lot line and additional shrubs could be planted. Commissioner Andrews inquired if the fence needs to be five-feet tall or could it be four feet in height. Mr. Pall stated that his daughter is very athletic, she is involved in gymnastics and could hop a shorter fence; so a taller fence is preferred because she does not understand danger.

Commissioner Andrews asked if the style of fence presented to the Commission is the type and style that would be installed. Mrs. Pall stated the exact type and style of fence has not been selected but the fence contractor will provide a brochure. Commissioner Andrews stated that Mr. & Mrs. Pall have mentioned that their daughter is very good at working through lock mechanisms and she asked what type of gate and lock would be provided. Mrs. Pall stated that the fence company would recommend a lock on the gate with a code system that could not be opened without the code. Commissioner Andrews stated that if a five-foot fence is proposed five-foot evergreens would be required around the entire fenced area.

Chairman Schermerhorn stated that the Village specifically has an ordinance that precludes fences in the Village of Indian Head Park. He noted that the only fences that are permitted are those required for safety to screen in-ground pools, screening along residential properties that directly abut a business district or existing fences that were installed prior to the zoning ordinance being established. Chairman Schermerhorn stated that he is not aware of a request for a fence as proposed this evening during his time on the Zoning Commission. He added that while the Commission is sympathetic to this particular request, the Commission must also take into consideration the neighbors that would be affected by a fence.

*PZC Minutes*
*June 5, 2007*

Chairman Schermerhorn stated that more specifics are needed as far as where the fence would be installed, the exact type and style of fence that is being proposed, the type of gate and lock mechanism and taking into consideration the concerns of the adjacent neighbors. He further stated that possibly a fence could be considered for a portion of the backyard or one that is less intrusive to the neighbors that can be screened. Chairman Schermerhorn stated that Mr. & Mrs. Pall previously stated that their daughter who is 6 years old could already scale a four-foot fence and he asked how long it would be before she could scale a five-foot fence. Chairman Schermerhorn asked Mr. & Mrs. Pall if they would be willing to come before the Village Board each year to establish the need for a safety fence if the fence were to be approved. Mrs. Pall stated that she was not aware there would be so much opposition to a fence from the neighbors and had she known neighbors in support of the fence would have been asked to attend as well. Commissioner Andrews pointed out that the public hearing was published and all neighbors had an opportunity to provide input on this zoning matter. Commissioner Andrews asked Mr. & Mrs. Pall if they have any pets. Mr.& Mrs. Pall stated that they have two dogs and invisible fencing was installed on their property.

Chairman Schermerhorn asked the Commission members if there is sufficient information to make a decision on this zoning matter. Commissioner Costelloe stated that the bigger decision is whether it would be fine to do it at all. Mrs. Pall stated that she was informed by the Police Department that a fence was granted for a special needs boy in the Village several years ago.

Tom Davis stated that he and his wife Lori live at 6482 Apache Drive which is immediately east of the subject property. Mr. Davis stated that when he and his wife purchased their home in 1978 it was a huge factor to buy in Indian Head Park because of the regulations that prohibit fences, certain types of detached structures and above ground pools. Mr. Davis stated that he and his wife are totally opposed to the proposed fence, it would be within five-feet of their window of their family room and the idea of a fence ruins the atmosphere of the Village which is a park-like setting. Mr. Davis stated that his children grew up being able to look down the entire property many houses down in both directions and it is an ideal type of environment. He added that his daughter who has two children bought a house on Thunderbird also because we do not allow fences. Mr. Davis pointed out that he has a neighbor immediately in back of his home that does not have a fence, the owners of that property have a severely retarded son that is microcephalic, he is very active, on occasion he comes over to visit in the yards over the years and the neighbors do not object. Mr. Davis stated that the ambience of the Village is such that it would set a dangerous precedence so that many other people moving in or currently here could turn around and want a fence also.

Judy Porta, of 6421 Mohawk Court, stated that the corner of her property would back up to the proposed fence. Mrs. Porta stated that she has lived in Indian Head Park for twenty-one years and she has two dogs that must always be on a leash because fences are not permitted and that is the way all of the residents have lived in this development area without fences. Mrs. Porta stated that one of her neighbors moved to Western Springs, their house is lovely and they do allow fences; everyone has fences everywhere, all type of styles and colors. She added that if that is what you want that is great, but that is why we live in Indian Head Park because there are no fences.

Mrs. Fran Pettersen stated that she resides on Mohawk and does not live directly next to the property in question but within close proximity. She pointed out that the Apache property is on a cul-de-sac and her neighbor Josephine at 6429 Mohawk would be impacted by a fence because there is not a lot of room between the property lines. Mrs. Pettersen stated that everyone is always concerned about property values, in the previous petition findings this evening it was mentioned -- "will it affect the essential character of the locality" and the northwest corner of the deck of the neighbors property at 6429 Mohawk to the property line is only twenty-feet.

Commissioner Andrews pointed out that lots are smaller in Planned Unit Development areas and you do not have land mass such as ½ acre lots in other residential areas of the Village. Commissioner Costelloe asked if there are any comments from neighbors regarding any modifications or a smaller version of the proposed fence. The consensus of all neighbors in attendance regarding this zoning petition is that no fences be allowed at all in this subdivision. Mrs. Ardizzone stated that she has lived in Indian Head Park for 28 years and likes the park like atmosphere without fences and does not want any child to be hurt.

Mr. Harry Abbott, of 6490 Apache Drive, stated that he has listened to Mr. Pall explain how he is concerned for the safety of his child but how could a person buy a house in a neighborhood that does not allow fences when he stated a fence is required for the safety of his child. Mrs. Pall stated that Indian Head Park is a great community and the idea is to stay in an area that her family already knows. Mrs. Pall stated that she did not ask anyone to sign a petition but there are people who are absolutely fine with a fence. Mr. Davis stated that it does not matter if someone who lives eight blocks or more away is in favor of a fence because they are not directly affected and do not live next door to it.

Chairman Dennis Schermerhorn and the Commission members reviewed the following Findings of Fact with regard to the residential property at 6472 Apache Drive to evaluate evidence presented in response to the following criteria before recommending a variation, as required by the Village's Zoning Ordinance, *Title 17 Zoning, Section 17.23.060E*: (1) that the property in question cannot yield a reasonable return if permitted to be used only under the conditions

*PZC Minutes*
*June 5, 2007*

allowed by the regulations governing the district in which it is located (not applicable -- this reference pertains only to commercial properties);
(2) the plight of the owner is due to unusual circumstances (all commissioners agree); (3) the variation, if granted, will not alter the essential character of the locality (all commissioners disagree); (4) the particular physical surroundings, shape or topographical conditions of the specific property involved would bring a particular hardship upon the owner as distinguished from a mere inconvenience if the strict letter of the regulation were to be carried out (not applicable); (5) the conditions upon which the petition for variation is based would not be applicable generally to other property within the same zoning classification (all commissioners disagree); (6) the purpose of the variation is not based upon a desire to make money out of the property (all commissioners agree); (7) the alleged difficulty or hardship has not been created by any person presently having an interest in the property (all commissioners disagree); (8) the granting of the variation will not be detrimental to the public welfare or injurious to other property or improvements in the neighborhood in which the property is located (all commissioners disagree); (9) the proposed variation will not impair an adequate supply of light and air to adjacent property, or substantially increase the danger of fire, or otherwise endanger the public safety, or substantially diminish or impair property values within the neighborhood (all commissioners disagree).

Commissioner Andrews moved, seconded by Commissioner Costelloe, to accept the findings of fact with regard to the zoning matter before the Planning and Zoning Commission this evening. Motion carried by unanimous roll call vote (4/0/2).

*Aye:    Chairman Schermerhorn and Commissioners: Andrews, Costelloe, Ingram,*
*Nay:    None*
*Absent: O'Malley, Yelnick*

Commissioner Costelloe moved, seconded by Commissioner Ingram, to present a recommendation to allow a safety fence to be installed at 6472 Apache Drive, as presented to the Commission. Motion denied. Carried by unanimous roll call vote (0/4/2).

*Aye:    None*
*Nay:    Chairman Schermerhorn and Commissioners: Andrews, Costelloe, Ingram,*
*Absent: O'Malley, Yelnick*

### REVIEW AND APPROVAL OF PLANNING AND ZONING COMMISSION MEETING MINUTES (DISCUSSION AND A POSSIBLE VOTE MAY TAKE PLACE)

- • *Minutes of the Planning and Zoning Commission Meeting held April 3, 2007*

*PZC Minutes*
*June 5, 2007*

Upon review of the minutes presented from the meeting held on Tuesday, April 3, 2007, Commissioner Andrews moved, seconded by Commissioner Ingram, to approve the April 3, 2007 meeting minutes, as presented. Carried by unanimous voice vote (4/0/2).

## VI.    ADJOURNMENT

There being no further business to discuss before the Commission, Chairman Schermerhorn entertained a motion to adjourn the meeting. Commissioner Andrews moved, seconded by Commissioner Costelloe, to adjourn the meeting at 9:00 p.m. Carried by unanimous voice vote (4/0/2).

Respectfully Submitted,
Kathy Leach, Recording Secretary
Planning and Zoning Commission